Jewel **OGLETREE**, as Personal Representative of the Estate of Si Edward Ogletree, Decedent, Plaintiff,

v.

**COLUMBIA COUNTY, FLORIDA, and City of Lake City, Florida,** Defendants.

No. 96–0629–CIV–J–21–A.

United States District Court, M.D. Florida, Jacksonville Division.

Aug. 13, 1997.

---

**2.** Plaintiffs' response, filed on January 28, 1999, at 2.

William J. Sheppard, Richard W. Smith, Sheppard & White, P.A., Jacksonville, FL, for Jewel Ogletree.

John W. Jolly, Jr., Skelding, Labasky, Corry, Eastman, Hauser, Jolly & Metz, Tallahassee, FL, for Columbia County, FL.

Victor M. Halbach, Jr., Marks, Gray, Conroy & Gibbs, P.A., Jacksonville, FL, for City of Lake City, Florida.

### *ORDER*

NIMMONS, District Judge.

This cause comes before the Court on Defendant City of Lake City's Motion for Final Summary Judgment (Dkt.21) and Plaintiff's Response (Dkt.32) and Supplemental Response (Dkt.49) in opposition thereto, as well as Defendant Columbia County's Motion for

Final Summary Judgment (Dkt.26) and Plaintiff's Response (Dkt.48) in opposition thereto.

## I. *Factual Background*

This case involves an armed standoff that occurred on the morning of June 7, 1994, in the heart of downtown Lake City, Florida, across the street from the Columbia County Courthouse. At that time, Plaintiffs decedent, Si Edward Ogletree ("Ogletree"), held law enforcement officers of both the Lake City Police Department ("LCPD") and the Columbia County Sheriff's Office ("CCSO") at bay for approximately two hours, before the CCSO Special Response Team ("SRT") moved in to physically apprehend Ogletree, at which time Ogletree raised his handgun towards the approaching SRT, whereupon Ogletree was immediately shot. Ogletree subsequently died from his gunshot wounds. The entire story of this sad event is best told as assembled from several of the depositions of the various parties involved as well as from videotapes of the last portion of the stand-off.

*Late Night of June 6, 1997, and Early Morning of June 7, 1994: Shawn Atkinson*

Shawn Atkinson ("Atkinson") began dating Ogletree in approximately December 1992, but broke off their relationship in May 1994 because of Ogletree's violent tendencies toward her. Atkinson testified that Ogletree, who was very jealous and distrustful of her, frequently became violent, hitting her repeatedly with his fists and kicking her so as to leave marks (although never injuring her so severely that she had to seek immediate medical attention). According to Atkinson, Ogletree had previously threatened to kill her and himself and had previously told her (she believes to intimidate her) both that he knew people in Jacksonville who could kill people and that he himself had killed someone in Jacksonville. Ogletree had also told Atkinson that if she ever reported his abuse of her to the authorities, he would not allow himself to be jailed.

Until the night of June 6, 1994, when he appeared unexpectedly at her apartment at about 11:00 P.M., Atkinson had not seen Ogletree since the end of the previous month when they broke up. Atkinson, surprised by Ogletree's arrival, told him to leave. Ogle-

tree refused and said he wanted to talk. Atkinson, afraid of what Ogletree might do, ran for the phone to call for help seconds before he kicked in her front door. Once inside, Ogletree told Atkinson that she was coming with him; she refused and he produced a small silver automatic pistol which he pointed at her. Ogletree then hit Atkinson, knocking her to the floor, and began kicking her. Ogletree stopped beating Atkinson, ordered her to get up, and marched her down the stairs and outside, pressing the gun against her back.

Ogletree then forced Atkinson into the front passenger side of her car, a Honda, then got into the driver's side and drove over back roads to his trailer. Along the way, Ogletree became angry when he noticed that Atkinson was wearing a necklace that he had previously told her he did not like her to wear. Ogletree ripped the necklace off of her neck and then placed his gun against the side of her head near her temple. He held the gun there for several seconds, positioned it in front of her face, and discharged it into the front passenger window, shattering the window but not causing it to fall out. Ogletree then told Atkinson that he was serious and could hurt her.

Upon arriving at his trailer, Ogletree forced Atkinson inside, where he produced a second handgun that he left lying on the counter. According to Atkinson, Ogletree, who was now yelling and angry as well as threatening to have Atkinson's family killed, told her that he would be happy if they would reunite. At another point, Ogletree stated that he had come home to die, but that if Atkinson were nice to him he would let her live. Atkinson tried to calm Ogletree, and assured him (falsely) that they would reunite. Ogletree, still holding a gun, then forced Atkinson to engage in sexual intercourse with him.

Apparently placated by Atkinson's assurances, Ogletree began to calm down over the next few hours. Atkinson then convinced Ogletree that he needed to take her back to her apartment so that she could get ready for work. Ogletree complied. Back at the apartment, Ogletree, still armed, again forced Atkinson to engage in sexual inter-

course with him. The two then slept briefly in the same bed, with Ogletree holding his gun all the while. Atkinson, who slept only fitfully, determined at that time that she would convince Ogletree to drop her off at work, where she could call the authorities.

According to Atkinson, Ogletree was substantially calmer the next morning, promising to fix her broken apartment door and car window. Ogletree then took Atkinson to her job at a local bank in a borrowed pick-up truck, leaving her car (with its shattered front passenger window covered by a bag or sheet) in the yard behind her apartment. Once safely at work, Atkinson called David Albritton, at that time a Lieutenant (and now Chief) with the LCPD.

*The Morning of June 7, 1994: Lieutenant David Albritton, LCPD*[1]

David Albritton ("Albritton") knew Atkinson from his contact with her approximately two weeks before the June 7, 1994, incident when she approached him and told him of her problems with and fear of her boyfriend (Ogletree) who beat her. On that occasion, Albritton advised Atkinson to seek a restraining order against Ogletree and file a criminal complaint with LCPD, but Atkinson never did.

When Atkinson phoned Albritton on the morning of June 7, 1994, she informed him of Ogletree's assault, kidnaping, and other actions the night before, and asked for help, stating that she feared that Ogletree was watching her at that moment. Albritton, along with LCPD Officer Gary Laxton ("Laxton"), went to the bank where Atkinson worked. Once there, Albritton viewed the bruises on Atkinson's upper body and noted that she appeared extremely frightened and disheveled, corroborating her allegations. At Atkinson's request, Albritton drove her to her parents' house on the outskirts of Lake City.

After dropping Atkinson off, Albritton returned to his patrol car and radioed the LCPD station, resulting in the dispatching of LCPD Officer James Finnell ("Finnell") to Atkinson's apartment to seek further corrob-

oration of her allegations. Finnell was told to consider Ogletree armed and dangerous. At the scene, Finnell confirmed that the borrowed truck being driven by Ogletree and Atkinson's Honda (with the front passenger window missing and covered by a bag or sheet) were present in the area behind her apartment. Finnell remained there observing the premises.

In the meantime, Lt. Albritton had returned to the station, near Albritton's apartment, to brief LCPD Chief Owens ("Owens"). While at the station doing so, Albritton heard Finnell radio in that Ogletree had exited the apartment and was attempting to leave in his truck. Albritton dispatched LCPD Officer Laxton to the scene, knowing that Laxton knew Ogletree. Albritton and Owens then went to the scene, where they remained until the standoff ended.

*The Initial Confrontation: Officer James Finnell, LCPD*

As noted above, Officer Finnell was dispatched to Atkinson's apartment to seek some further corroboration of her allegations. While observing the premises, Finnell saw Ogletree emerge, move towards and get into his truck, at which time Finnell pulled his patrol car into the driveway, blocking the truck. Both men exited their vehicles, and Ogletree reached into his back pocket and withdrew a small silver automatic pistol. At the same time Officer Finnell drew his weapon and took aim at Ogletree, directing him to drop his weapon and surrender. Ogletree refused, stated that he would not go to jail and that he wanted Finnell to kill him, and then placed the gun to his head and later in his mouth, eventually removing it and holding it down by his side. Within a few minutes, LCPD Officer Laxton arrived, drew his weapon, and, along with Finnell, kept their weapons trained on Ogletree to contain him. When Laxton arrived, Ogletree also asked Laxton to shoot him, but Laxton refused. Shortly thereafter, LCPD Chief Owens arrived on the scene.

---

1. Many of the law enforcement personnel involved in this case have subsequently been promoted to different ranks or changed occupations. However, for ease of reference to the record, the Court will, as the parties have done, refer to all individuals by their rank or position as of June 7, 1994.

*The Scene: Outside Shawn Atkinson's Apartment*

As noted previously, Atkinson's apartment was located in downtown Lake City, across the street from the Columbia County Courthouse. The apartment was located in a house which was the third building in from the corner. On the corner was a bank (apparently the same at which the CCSO SRT would subsequently stage); between the bank and Atkinson's house was another house. Between this second house and Atkinson's apartment was a large thick shrub, roughly five to six feet tall. On the other side of the building containing Atkinson's apartment was another house. Each of the houses on either side of Atkinson's apartment are set very close to the street, with nothing more than what appears to be the typical utility easement between the building and the curb. Atkinson's building, however, is set substantially back from the street, and occupies almost all of the breadth of the lot. The yard between the building and the street was, at the time of the incident, an open area with sparse grass and only two small trees, both of which are located on the far side of the lot from the driveway. The view to the street is open, and obstructed only by a utility pole.

Immediately next to the shrub between the second house and Atkinson's house was a driveway. The pick-up truck that Ogletree was driving was parked in this driveway, pulled up into the lot close to the apartment; Officer Finnell's LCPD patrol car was positioned directly behind it, with the rear of the patrol car coming roughly even with the edge of the shrub, only a few feet in from the street. Atkinson's Honda sedan was parked up in the lot away from the street, beside Ogletree's truck, but at a forty-five degree angle to the truck. The passenger side of Atkinson's car, with a light-colored sheet or bag hanging over the front window, was clearly visible from the street.

*The Beginning of the Standoff: Chief Frank Owens, LCPD*

When LCPD Chief Owens arrived on the scene, he and Albritton, along with other law enforcement and related personnel, established an "inner perimeter" along the curb (behind some cars parked there) to try to contain Ogletree to the immediate area of the yard. About this time, William Gootee ("Gootee"), an FDLE Officer, Cedric Davis, an Investigator with State's Attorney's Office, and Robert Dekle ("Dekle"), an Assistant State Attorney with the Third Judicial Circuit, all of whom were armed, happened upon the scene and, along with Chief Owens, Lt. Albritton, Officers Laxton and Finnell, established themselves in a line across the front of the property where Ogletree was standing, in an attempt to contain him and prevent his flight. As more officers arrived, an outer perimeter was set up for the safety of the public and to keep them from interfering with communications with Ogletree.

Chief Owens, who testified that he had attended multiple classes and seminars on law enforcement negotiation with suspects in different situations, including with both armed and unarmed individuals, assumed the role of lead negotiator with Ogletree, who had now taken to pacing around the lot where he was contained, still armed with the handgun. However, although Chief Owens was the lead negotiator, the other officers and individuals forming the inner perimeter spoke with Ogletree at times during the negotiations, generally in response to his statements to them. At a point early in the negotiations, concluding that his officers were not equipped to deal with the situation should Ogletree choose to become more aggressive, Owens directed Albritton to contact the Columbia County Sheriff's Office and inquire about the availability of the CCSO SRT, which Albritton did.

On June 7, 1994, Tom Tramel, the Sheriff of Columbia County was in Tallahassee. Thus, the ranking member of the CCSO in Lake City was Major James Doyle Rooks ("Rooks"), the CCSO Chief of Operations. Rooks, along with CCSO Deputy Gregory Delgado ("Delgado"), who commanded the SRT, arrived at the scene shortly after Owens and the other officers had established the inner perimeter to contain Ogletree. However, because Ogletree became agitated when he saw uniformed members of the CCSO arrive at the scene, and announced that he did not want any CCSO officers around, all of these officers assumed positions across the street in and around the Courthouse and its

parking lot. ASA Dekle, who was part of the inner perimeter with Chief Owens, then acted as an informal liaison between the LCPD and CCSO, relaying messages between Owens and Rooks / Delgado.

By the time he arrived at the Courthouse, Delgado had summoned the members of the SRT, who gathered their equipment and assembled at a site near the scene, where Delgado briefed them on the situation. The SRT remained there waiting should they be called in. Rooks assigned Dennis Peters ("Peters"), the SRT sharpshooter, to the Lake City County Courthouse to find a position from which he could observe Ogletree and cover the SRT should they be called to move in. Peters selected a position in a room on the second floor of the Courthouse.

*The Negotiations*

The standoff itself lasted approximately 80–90 minutes.[2] Initially, Owens (along with the other officers, when they were spoken to by Ogletree) attempted to convince Ogletree to lay down his weapon and surrender. Owens estimates that he was talking with Ogletree about 90% of the time during the standoff. Owens testified that he perceived Ogletree to be in an emotional state, though "normal" for what he would expect from someone in Ogletree's position. During the negotiations, Owens perceived Ogletree to be generally resistant to any attempts to negotiate and possibly get to the root of what had agitated him. Owens partially blames difficulties in negotiating with Ogletree on the environment of the scene, which Owens felt was not most conducive to negotiations because it was outside and contained various distractions. Although Owens testified that he kept trying to bring Ogletree back to the issues that needed to be dealt with (i.e., his surrender), he found Ogletree unwilling to reciprocate in the discussion, despite Owens'

promises that Ogletree would be provided whatever help he needed if he surrendered.

On the morning of the incident, three individuals who knew Ogletree and considered him a friend heard of the incident and went to the scene to offer their help. These individuals were Dewitt Cason ("Cason"), the Clerk of Circuit Court, Terry Crews ("Crews"), the Director of Public Works for Lake City, and Curtis Dudgeon ("Dudgeon"), an employee of the Lake City Gas Department. Dudgeon was allowed to come to the inner perimeter beside Chief Owens and speak with Ogletree; Cason and Crews were not.[3]

Dudgeon knew Ogletree and had previously spoken with him when he was depressed and angry about his troubles with the women in his life. Dudgeon testified that he had not known Ogletree to be violent or suicidal; however, Dudgeon did recall that previously, about a year prior to the June 7, 1994, incident, and after another fight with a girlfriend, Ogletree stated to him that, "he [Ogletree] didn't have enough guts to kill himself, ... so he wanted somebody to kill him. He knew all you had to do is point a gun at a police officer, and that's how you get shot." However, because Ogletree was so upset on that previous occasion, Dudgeon thought he was just bluffing and would not actually follow through with this "plan."

Throughout the time that he was participating in the negotiations, Dudgeon was standing with Chief Owens at the curb at the edge of the lot where Ogletree was contained. Although both Dudgeon and Ogletree asked separately that Dudgeon be allowed to go up onto the property and speak with Ogletree, Owens would not allow Dudgeon to do so for his own safety. Instead, Owens made Dudgeon stay beside him at the curb (the edge of the inner perimeter) during

**2.** Chief Owens estimated that the standoff lasted approximately ninety minutes. Inference from Plaintiff's Complaint (Dkt.1, ¶¶ 15, 22) puts the standoff at about 80 minutes.

**3.** Crews, upon arriving, spoke with ASA Dekle, apparently while he was at the outer perimeter, and asked Dekle to convey to Owens that he (Crews) knew Ogletree and thought he could help if allowed to talk to him. Dekle conveyed this message, but, after failing to get a response,

Crews withdrew to the sidelines for the remainder of the standoff and did not offer his help again. Similarly, upon arriving at the scene, Cason went to Major Rooks and told him that he knew Ogletree and offered his help. (Cason cannot recall whether he told Rooks that he knew Ogletree to suffer from depression). Rooks, however, refused to let Cason through, so Cason, like Crews, withdrew to the sidelines for the remainder of the standoff.

the negotiations. Dudgeon testified that he was able to speak with Ogletree from the curb, although the presence of the other officers hampered his ability to communicate with Ogletree.

At another point, Ogletree asked to speak with Atkinson personally. Given that it appeared to them that Ogletree had assaulted and otherwise terrorized Atkinson the night before, Owens (and Lt. Albritton) feared for her safety should she brought to the scene; thus they refused to allow a face-to-face meeting. However, Owens did offer to let Ogletree speak to Atkinson by phone. Ogletree accepted, but Owens could not immediately find a phone with a working battery. Owens testified that when he asked Ogletree for more time to get a working phone, Ogletree reacted as if the officers were trying to deceive him, refusing to give the officers more time and dropping his request to talk to Atkinson.

Around the middle of the negotiations, Chief Owens testified that he discussed with Lt. Albritton the possibility of bringing a mental health professional to the scene to aid the negotiations, but decided against doing so because of what he perceived to be a high level of mistrust between Ogletree and the officers, and the resulting danger to anyone that the officers might bring in to the negotiations. Chief Owens further testified that he did not otherwise consult with a mental health professional because to do so would have required that person to come to the scene and be put in danger.

As the negotiations continued, Ogletree requested a tape recorder and a Coca–Cola. Both items were provided to Ogletree. Ogletree drank the drink and used the tape recorder to make various testamentary dispositions; this latter fact, however, was apparently not known to any of the law enforcement officers on the scene. Chief Owens testified that after Ogletree finished using the recorder, he "shut off" the officers at the scene. By this time, according to the estimates of several different eyewitnesses, a crowd of approximately 100 to 150 individuals had gathered and

were watching the standoff from the periphery of the outer perimeter.[4]

Chief Owens testified that, as time passed after the events above, he sensed that his rapport with Ogletree was worsening, and he began to fear that at any moment Ogletree might "raise the pistol and begin firing." Owens considered the negotiations to basically be over at this point, and that the most he could do was to maintain the situation, without worsening it, until additional resources (i.e., the SRT) could be utilized. Although Chief Owens testified that he did not know the SRT's exact plan for apprehending Ogletree once they were called in, Owens testified that, from speaking with Rooks and Delgado, he understood Ogletree to have been involved in a similar standoff situation before and to have immediately surrendered when he saw the CCSO SRT.

When Chief Owens discussed the utilization of the SRT with Rooks and Delgado, they made clear to him the conditions (both their own and those of Sheriff Tramel, communicated to Rooks by phone) under which the SRT would become involved and the possible consequences of such. Chief Owens was instructed that the SRT would not move in until all LCPD officers withdrew and that once deployed the SRT would do whatever was necessary to end the standoff peacefully, but that if Ogletree pointed a weapon at the SRT, or anyone else, the SRT would likely shoot in defense. As Chief Owens then stated his understanding of these conditions and did not withdraw his request, Sheriff Tramel, with the recommendation of Major Rooks at the scene, approved the deployment of the SRT. At this point, Delgado deployed other CCSO officers to block the possible paths of escape between Atkinson's apartment building and the buildings on either side, and ordered the SRT to begin moving in on Ogletree's position.

It was at this point that the officers and other individuals at the inner perimeter began to withdraw from the scene, moving back from their positions into the street and away, towards the side of the lot opposite from the

---

4. One of the two videotapes submitted is consistent with this estimate. At one point during this tape, the camera pans briefly to one side, showing a group of several dozen people gathered outside one building beyond the end of the block where the standoff occurred.

shrub and driveway. (i.e., to their right as they faced Ogletree.) The last individuals of the inner perimeter to withdraw were the two LCPD officers who were standing by the patrol car in the driveway. Each of these also withdrew back into the street (to their right) and away from the driveway.[5] The rest of the remaining events are best told from the videotapes, described below.

*The End of the Standoff: The Videotapes and Still Pictures*

In addition to more than one dozen depositions, the parties have also submitted videotapes of the last twenty-five to thirty minutes of the standoff (Dkt.33), as well as two series of still photographs (Dkt.31) made from the videotapes. The videotapes, apparently filmed from two roughly side-by-side cameras situated in or in front of the Columbia County Courthouse, and across the street from and slightly to the side of the lot where Ogletree stood, show a scene and events consistent with the accounts provided by the various witnesses to and participants in this event. That is, the tapes show Ogletree moving freely around the yard behind Atkinson's apartment, pacing up and down, at times coming within several feet of the officers behind the cars at the curb or those by the patrol car in the driveway, holding the small pistol in his right hand, and at times speaking to the various law enforcement officers (although the audio of this portion of the videotape is, for the most part, inaudible).

The critical last few minutes of the tape show two individuals near one of the cars parked at the curb withdrawing to the their right (also the right of the screen; a voice on the tape identifies these people as Chief Owens and Cedric Davis). Then, approximately forty-five seconds later, one of the two uniformed LCPD Officers standing by the patrol car withdraws, backing away slowly towards the right of the screen, followed by the other officer about ten seconds later. As the second officer withdraws, Ogletree walks

right, diagonally across the lawn and away from the driveway, towards the curb, until this officer is roughly in the middle of the street, at which time Ogletree turns around, with his back facing towards the street, and walks back towards the driveway. Within this time, about the next fifteen seconds, the CCSO SRT has moved to the edge of the shrub, just to the viewer's left of the driveway of the property where Ogletree stands. The SRT is visible from the perspective of the cameras, but apparently not visible to Ogletree until it is even with the shrub. As the SRT rounds the shrub in a group, with the three front members holding ballistic shields with the word "SHERIFF" emblazoned on them in large white letters, a voice can be heard shouting some inaudible words followed by the words "Sheriff's Office." Ogletree looks to his right at the SRT and begins to raise his weapon toward them. As the SRT continues advancing towards Ogletree, what sounds to be the same voice yells, "Drop your weapon. Drop your weapon." Ogletree continues to raise his weapon, leveling it at the SRT, whereupon a burst of gunfire can be heard.[6] Ogletree falls to the ground, the SRT approaches and handcuffs him, and other law enforcement personnel converge on the scene. Within a minute's time, an ambulance arrives on the scene, and EMT personnel place Ogletree on a stretcher and load him in the back of the ambulance, which then departs the scene.

## II. *Summary Judgment Standard*

The Court will enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. On the issue of materiality, "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are

---

**5.** Although he was supposed to withdraw fully with the other LCPD officers, Lt. Albritton apparently did not fully withdraw, instead staying near the cars at the curb in order to provide cover for the retreating officers.

**6.** Lt. Albritton, who had apparently not withdrawn fully and remained near the cars at the

curb to cover the other withdrawing LCPD officers, fired one round at Ogletree when he leveled his weapon at the SRT. Apparently through ballistic tests, it has subsequently been determined that Ogletree was struck both by bullets fired by members of the SRT as well as by a bullet fired by Lt. Albritton.

those over which disputes "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505.

The movant bears the burden of establishing the absence of dispute over material facts. *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Where, as here, the party opposing the summary judgment motion has the burden of proof at trial, the moving party must either point out to the Court specific portions of the record which show that the nonmoving party cannot prevail at trial, or introduce affirmative evidence negating the opposing party's case. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991). In determining whether the party seeking summary judgment has met its initial burden, the Court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606 (11th Cir.1991). Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. *Reynolds*, 989 F.2d at 469. If the moving party does not meet its burden, the motion for summary judgment will be denied. *Four Parcels of Real Property*, 941 F.2d at 1437. Where the moving party meets its initial burden, the burden shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.

### III. *Municipal Liability Under 42 U.S.C. § 1983*

#### A. Generally

In *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), based upon its interpretation of the legislative history of § 1983, the United States Supreme Court held that municipal governments could not be sued under that statute. Seventeen years later, in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court expressly overruled *Monroe*, but limited the liability of municipal governments to instances in which the alleged constitutional deprivation or violation could be traced to an unconstitutional or illegal policy of the municipal government that causes the alleged constitutional viola-

tion. *See id.* at 691, 98 S.Ct. 2018 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal liability of some nature caused a constitutional tort.") It has been said that there are five generally recognized means by which a § 1983 plaintiff can establish a municipal custom or policy. Erwin Chemerinsky, *Federal Jurisdiction* § 8.5.2, p. 447 (1994). These are:

(1) the actions of the relevant municipal legislative body ("MLB"); (e.g., a city council's firing of a government official without providing procedural due process)

(2) the actions of a municipal agency or board exercising authority delegated by an MLB; (e.g., an employment department's regulation requiring all pregnant women to take unpaid leave)

(3) the actions of a municipal official who possess final decision-making authority; (e.g., a county prosecutor's direction of police to act unreasonably in serving a subpoena)

(4) a municipal policy of inadequate training or supervision; and

(5) a custom (i.e., a practice not formally approved by the MLB) of constitutional violations.

*See* id. pp. 447–53.

#### B. Allegations of Plaintiff's Complaint

Plaintiffs four-count Complaint (Dkt.1) contains three causes of action predicated on 42 U.S.C. § 1983 and one state-law based cause of action pursuant to the waiver of sovereign immunity contained in § 768.28, Fla.Stat. The core allegations of Plaintiff's Complaint, contained in paragraphs 30 & 31 thereof, are that "the use of force, deadly or non-deadly, was clearly excessive, unreasonable, and unnecessary" and that "Ogletree's death was directly and proximately caused by the actions and omissions of the defendants pursuant to official county and municipal policy, custom, or usage...."

Count I of Plaintiff's Complaint alleges that defendants and their agents, acting within their authority and under color of state law, instituted and followed policy, pro-

cedures, and customs directly resulting in the use of excessive force against Ogletree, causing his death, actionable under § 1983 as a violation of the Fourth and Fourteenth Amendments, and which reflected deliberate indifference to Ogletree's constitutional rights.

Count II of Plaintiff's Complaint alleges that defendants and their agents, acting within their authority and under color of state law, instituted and followed policy, procedures, and customs of inadequate supervision directly resulting in the use of excessive force against Ogletree, causing his death, actionable under § 1983 as a violation of the Fourth and Fourteenth Amendments, and which reflected deliberate indifference to Ogletree's constitutional rights.

Count III of Plaintiff's Complaint alleges that defendants and their agents, acting within their authority and under color of state law, failed to adequately train the relevant law enforcement personnel, reflecting a deliberate indifference to Ogletree's constitutional rights, directly resulting in the use of excessive force against Ogletree, resulting in his death, actionable under § 1983 as a violation of the Fourth and Fourteenth Amendments.

Count IV, predicated on Florida law, alleges that the defendants acted negligently, inter alia by using excessive force, with regards to Ogletree.

## IV. *Defendants' Summary Judgment Motions as to Counts I, II, and III*

### A. The Parties' Experts

Each party has proffered expert testimony regarding the actions of the Defendants on June 7, 1994, towards Plaintiff's decedent. In light of the state of the factual record and the relevant case law, the Court does not find the experts' testimony particularly helpful. Nonetheless, the Court will briefly review this testimony.

Having reviewed the videotapes and most, if not all, of the depositions, Plaintiff's expert opines that the Defendants exhibited "outrageous police behavior ... in violation of generally accepted police custom and practice." While generally conceding that Chief Owens conducted "reasonable" negotiations, Plaintiff's expert primarily questions the basis

upon which Chief Owens determined that the negotiations should end, criticizing his decision to terminate the negotiations at the point he did. When asked how long Owens should have continued the negotiations, Plaintiff's expert testified that negotiations should have continued until Ogletree "started becoming an imminent threat to police officers or citizens, ... [e.g.] without provocation ... raising his gun at an officer or firing shots or trying to [ ] break out of that inner perimeter." Plaintiff's expert also criticizes the SRT's plan to apprehend Ogletree by appearing suddenly from around the shrub and moving in to tackle him or knock him down, opining that such a plan made Ogletree's death inevitable, and amounted to "a plan to kill him."

Defendants' expert disagrees that the shooting of Ogletree was unnecessary and unjustified. Opining that the lethal range of the gun possessed by Ogletree was approximately 100 yards (an area which he opines was impossible to secure given the location of the standoff), and noting that Ogletree, although partially contained, was free to move about the yard, Defendants' expert testified that, by the time the SRT moved in, the safety of the public was at risk and had to be balanced with Ogletree's interests. Defendants' expert also defends the SRT's decision to give Ogletree little warning of their actions, opining that, if the SRT had approached Ogletree head-on, Ogletree would have had a greater opportunity to harm them. Further, although acknowledging that various non-lethal force weapons exist (e.g, stun guns, etc.) Defendants' expert testified that no such weapons would have been appropriate given the characteristics of this standoff. Lastly, Defendant's expert challenges the opinion of Plaintiff's expert that this incident was (or could be analogized to) one involving hostage negotiation or a barricaded suspect.

### B. Discussion

■ A necessary prerequisite to any finding of municipal liability under § 1983 is the occurrence of a constitutional violation, for if the acts or omissions of a particular municipal officer for which a plaintiff seeks to sue a

municipality under § 1983 are found to be constitutional, then there can be no recovery under § 1983. *See Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (holding that determination that officer's conduct did not violate any constitutional rights precludes municipal liability under § 1983 as well as any inquiry into constitutionality of municipal policies, practices, or customs); *accord Rooney v. Watson,* 101 F.3d 1378, 1381 (11th Cir.1996); *Vineyard v. County Of Murray, Georgia,* 990 F.2d 1207, 1211 (11th Cir.1993).

## 1. The Fourth Amendment Generally

In this case the constitutional right alleged to have been violated was Ogletree's right to be free from unreasonable seizures (i.e., not to have excessive force used against him) as prohibited by the Fourth Amendment to the U.S. Constitution (and made applicable to the States through the Fourteenth Amendment.[7]) The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

 It is clear that the apprehension of a suspect by deadly force (e.g., shooting) is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *see also Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Where a law enforcement officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others (e.g., when the suspect threatens that officer with a weapon or there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm) it is constitutionally reasonable to use deadly force. *Garner,* 471 U.S. at 11, 105 S.Ct. 1694. Where feasible, some warning should be given. *Id.* at 11–12, 105 S.Ct. 1694.

 "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . and requires careful attention to the facts and circumstances of each particular case." *Connor,* 490 U.S. at 396, 109 S.Ct. 1865 (citations omitted). The overall focus of an inquiry to determine the constitutionality of a seizure is the judicial balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. *Garner,* 471 U.S. at 8, 105 S.Ct. 1694.

 One of the specific factors to be considered in a Fourth Amendment reasonableness inquiry is the extent of the intrusion; thus reasonableness necessarily implicates both when a seizure is made and how it is carried out. *Id.* at 8, 105 S.Ct. 1694. Deadly force is the most intrusive type of seizure. *Id.* at 9, 105 S.Ct. 1694. Additional specific factors in the reasonableness inquiry include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others,

---

7. Counts I, II, and III of the Plaintiff's Complaint all assert that the alleged use of excessive force by the Defendants is actionable under § 1983 as violations of Ogletree's Fourth and Fourteenth Amendment rights. However, since the Supreme Court has held that a free citizen's claim that law enforcement officers used excessive force in the course of a seizure of his person are properly analyzed under the objective reasonableness standard of the Fourth Amendment, and not under a Fourteenth Amendment substantive due process analysis, *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Court reads the Plaintiffs reference to the Fourteenth Amendment in her Complaint to merely be an implicit reference to the fact that the prohibitions of the Fourth Amendment have

been expressly held to be applicable to the States through the operation of the Fourteenth Amendment, *see generally, e.g., Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). This is entirely consistent with the Supreme Court's express direction in *Connor, see* 490 U.S. at 395, 109 S.Ct. 1865 (infra), as well as the Court's implicit direction (by example) in the seminal excessive force case of *Tennessee v. Garner, see* 471 U.S. 1, 5, 7–8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (analyzing constitutionality of challenged application of deadly force to unarmed fleeing felony suspect under reasonableness standard of the Fourth Amendment, even though complaint therein alleged violations of both the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment).

and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Connor,* 490 U.S. at 396, 109 S.Ct. 1865. The Supreme Court has directed that the reasonableness inquiry be undertaken from the perspective of a reasonable officer on the scene under the same conditions, rather than with the ²⁰⁄₂₀ vision of hindsight, as the former allows for proper appreciation of the fact that police officers are often forced to make their decisions about how much force is necessary in situations that are tense, uncertain, and rapidly evolving. *Connor,* 490 U.S. at 396–97, 109 S.Ct. 1865. Lastly, it must be emphasized that the reasonableness inquiry of the Fourth Amendment is an objective standard—whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him at the scene, without regard to his underlying intent or motivation. *Connor,* 490 U.S. at 397, 109 S.Ct. 1865.

### 2. The Seizure of Ogletree Specifically

In this case, the challenged action is the Defendants' seizure of Ogletree. However, before undertaking the Fourth Amendment reasonableness analysis, there is a predicate issue which merits discussion: exactly when did the seizure complained of occur. As the parties have argued, this issue is particularly relevant because the determination of the point at which the seizure occurred provides the chronological starting point for analyzing the reasonableness of the Defendants' actions.

Pursuant to the Supreme Court's decision in *U.S. v. Mendenhall,* 446 U.S. 544, 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Considered alone, *Mendenhall* would seem to dictate, as Plaintiff advocates, that Ogletree was seized throughout the entire standoff including, of course, when he was shot. This would make the factual scope of the Court's reasonable-

ness inquiry quite broad. However, there is an additional element to the analysis of when a person is seized, provided by the Supreme Court's subsequent decision in *California v. Hodari,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In *Hodari,* the Court held that, for purposes of the Fourth Amendment, a "seizure" requires not only that the reasonable person feel that he is not free to leave, but also that the subject actually yield to a show of authority from the police or be physically touched by the police. *Id.* at 626 (111 S.Ct. at 1550). Since it is undisputed that Ogletree never yielded to a show of authority (i.e., dropped his weapon and surrendered himself to police custody) and was never physically touched by the police until he was shot, *Mendenhall* and *Hodari* would seem to compel the conclusion, as Defendants advocate, that Ogletree was not "seized" for purposes of the Fourth Amendment until he was shot by the officers. This would substantially narrow the factual scope of the Court's reasonableness inquiry.

The position advocated by the Defendants seems further compelled by Circuit precedent. In *Menuel v. City of Atlanta,* 25 F.3d 990 (11th Cir.1994), the Eleventh Circuit considered *Hodari* as applied to a situation involving an individual who was surrounded by multiple police officers, and who had no means or opportunity for escape, making her capture a mere eventuality, "bound probably to occur only at a time and in a manner prescribed and implemented by the police." *Id.* at 995. In that case, the Eleventh Circuit concluded that this "intransigent" individual, who had neither yielded to physical force (as none was applied to her before the fatal shooting) nor submitted to a display of authority (of which there was a significant amount before the shooting), was not meaningfully or effectively seized in the Fourth Amendment sense until she was shot. *Id.* at 995. The similarities to this case, in which Ogletree was generally confined to the yard behind the apartment, but had not surrendered or submitted to a significant show of authority, are readily apparent.[8]

---

**8.** One could argue that *Menuel* is factually distinct from the instant case, inasmuch as the *Menuel* suspect was confined to one room of a house and was believed by the officers involved to be either unarmed or, at most, armed with a knife. In the instant case Ogletree was armed

with a pistol (which the officers had to assume was loaded and operational) and was encircled in a large outdoor area from which he possibly could have escaped. But, in the Court's view, the factual differences between the cases balance

While the Court believes that *Hodari* and *Menuel* inescapably compel the conclusion that Ogletree was not seized for purposes of the Fourth Amendment until he was shot, it is unnecessary to actually decide this issue because the Court concludes that, no matter whether Ogletree was seized only as of the moment that he was shot or was seized as early as the time when LCPD Officer Finnell confronted Ogletree, the actions of the agents of both Defendants were objectively reasonable under the Fourth Amendment.

No one argues that the extent of the seizure here (i.e., the intrusion on Ogletree's Fourth Amendment rights) was of the largest magnitude—Ogletree was shot and killed by the Officers. But the Court is convinced that, pursuant to the relevant Supreme Court precedent, the governmental interests being balanced with Ogletree's interests are far more weighty. *See Connor*, 490 U.S. at 396–97, 109 S.Ct. 1865.

At the time of the standoff, Ogletree was armed with a handgun and unconstrained in a densely-populated area of a city. Additionally, the authorities had sufficient information from which they could reasonably believe that Ogletree had, since the night before, engaged in a pattern of increasingly aggressive and overtly violent criminal acts, including assault, burglary, armed kidnaping, and multiple sexual assaults, leading up to his act of drawing a gun when confronted by a law enforcement officer, finally culminating in the armed standoff. The severity of the crimes already committed by Ogletree, as well as those threatened to be committed by him, were of the highest order: acts threatening the lives of multiple innocent citizens. *See id.* at 396, 109 S.Ct. 1865.

From the foregoing facts, it is also clear that Ogletree posed an immediate threat to the safety of the officers and the many citizens in the immediate area. This threat was both direct (Ogletree could have begun shooting at the officers or bystanders) and indirect (Ogletree could potentially have initiated a running gun battle that would have

threatened the safety of many in the area). *See id.*

Lastly, in spite of all of the foregoing and of a significant show of opposition, Ogletree actively resisted submission to the asserted authority of the law enforcement officers on the scene. Although repeatedly asked and told to put down his weapon and surrender, Ogletree continually refused, pacing about with a gun in his hand. *See id.*

Viewed from the position of the officers on the scene who were involved in this tense and uncertain situation that threatened to quickly evolve into a scene of great violence, the Court is convinced that, in light of the facts and circumstances confronting them at the scene, it can not be reasonably asserted that the officers acted in an objectively unreasonable manner. *See id.* at 396–97, 109 S.Ct. 1865.

## C. The Asserted Disputed Material Facts

In her Responses (Dkts. 32 & 48) and Supplemental Response (Dkt.49) to Defendants' summary judgment motions, Plaintiff presents what she contends are disputed, material factual issues. However, because these issues are either moot in light of the Court's conclusions, not genuinely disputed, immaterial, or even irrelevant, the Court concludes that none of these asserted issues precludes the entry of summary judgment. Nonetheless, in the interest of completeness, the Court will briefly address these issues.

*Law Enforcement Command and Control Issues*

In the motions and responses, the parties argue at some length whether Chief Owens was the ranking law enforcement officer on the scene, whether the City and the County acted in concert in seizing (i.e., employing deadly force against) Ogletree, and whether the City (through Chief Owens) had completely passed off all law enforcement (and other) responsibility for the incident to the County at the time that the LCPD withdrew

out. While the fact that Ogletree was armed with a hand gun could make him a more dangerous suspect to confront and attempt to physically apprehend than someone armed only with a knife, the fact that Ogletree was outside, free to

roam an entire yard at will, and potentially able to escape his "confinement," makes him far more dangerous to the public than someone like the *Menuel* suspect who was confined to one room in a house.

and the CCSO SRT moved in to apprehend Ogletree. These issues would otherwise be relevant and material except for the fact that the Court has already determined that the actions of all the law enforcement officers on the scene were objectively reasonable under the Fourth Amendment. Only if there were some question about the reasonableness of their actions would this issue of control/concerted action become relevant.

*Whether Ogletree was Startled by the SRT/Whether Ogletree Assumed a "Shooter's Stance"*

Plaintiff has presented the testimony of several witnesses which it is asserted create genuine disputes about the issue of whether Ogletree was startled by the SRT's unannounced appearance and, consequently, whether Ogletree's act of raising his pistol at the SRT was more of an involuntary than voluntary action. The Court concludes that this issue is neither material nor genuinely disputed.

All of the eyewitnesses' deposition testimony, as well as a viewing of the videotapes, agree that Ogletree straightened his arm and raised his gun, which had been resting at his waist, to eye-level, as one would do to take aim, and pointed it directly at SRT. From this evidence it is clear that Ogletree's acts were conscious and deliberate and, more importantly, could be reasonably interpreted (from the perspective of the SRT and those watching) to evince an intent to fire that gun at the SRT. From this, the officers who shot Ogletree could reasonably conclude that Ogletree posed a threat of serious physical harm to themselves, the other officers, and/or the bystanders, justifying the use of deadly force against him. *See Garner,* 471 U.S. at 11, 105 S.Ct. 1694.

*The Overall Threat Posed by Ogletree*

Plaintiff cites to the depositions of multiple witnesses, as well as her expert's deposition and report, contending that Ogletree was not a threat to the law enforcement officers on the scene or the public at large, or at least was not such a threat as to justify the use of deadly force. This allegedly disputed issue is phrased many different ways: whether Ogletree was a threat because in Dudgeon's opinion he never acted in a threatening manner throughout the standoff; whether Ogle-

tree was threatening because, in Crews' opinion, he was "docile" throughout the standoff or because, in Dekle's opinion, he was "jocular" with some of the officers at various times during the standoff; whether Ogletree had homicidal intentions; whether the threat posed by Ogletree was greater because he was out in the open (versus barricaded in a building); and whether Ogletree was a threat because, in Fyfe's opinion, he did not threaten any bystanders and there was no "indication" he tried to escape.

All of these asserted issues overlook the fact that Ogletree was an armed man who had committed a string of violent acts toward others within the preceding hours and who was standing unconstrained in a highly-populated area and refusing to surrender himself to a significant show of authority. Such a person is unquestionably a serious threat to the public, and especially to the officers who formed the front line seeking to blunt, and hopefully contain, any attempt Ogletree might make to harm those around him. These asserted issues are precisely the sort of second-guessing, viewing the situation from a perspective other than that of the officer on the scene, aided by hindsight, that the Supreme Court has directed is not to be undertaken in these cases. *See generally Connor,* 490 U.S. at 396–97, 109 S.Ct. 1865.

*The Reasonableness of the Length and Conduct of Chief Owens' Negotiation*

This issue is significantly intertwined with the issue of whether Ogletree was a threat, the relationship between the two being that the less of a threat that Ogletree was, the longer, Plaintiff contends, that Chief Owens should have continued to negotiate with him. The Court finds these issues immaterial, as, once again, this is the sort of second-guessing that precedent dictates is not to be entertained in analyzing these cases. Chief Owens was on the scene from nearly the beginning of the negotiations. He observed and dealt with Ogletree throughout that entire time. At the point at which he asked the CCSO to deploy the SRT he had come to the conclusion that negotiations had reached a standstill, that Ogletree had become distrustful of Chief Owens and the officers, and that Ogletree would, at any moment, begin

to fire at the officers or others in the vicinity. *See, supra,* page 1355.

Additionally, the Plaintiff has presented the testimony of Cason and Crews, both of whom requested but were denied the opportunity to participate in the negotiations, to support the assertion that Chief Owens conducted his negotiations in an unreasonable manner. This too, the Court concludes, is further post facto dissection and criticism of the various decisions made by Owens (and other officers) in the heat of the moment. Owens' decision not to allow these individuals to participate in the negotiations (and thereby further endanger themselves) is clearly reasonable, especially in light of the lack of any constitutional obligation to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. See infra.

*Whether it was Necessary to Use Deadly Force Against Ogletree*

This issue is perhaps the crux of Plaintiff's arguments. Additionally, there is the substantially similar issue raised by Plaintiff of whether the Defendants exhausted all efforts to resolve the standoff peacefully. (Inherent in this second issue is the asserted disputed issue of whether there existed reasonable non-lethal alternatives.)[9] The primary thrust of the Plaintiff's claims in this suit is that the Defendants violated Ogletree's constitutional rights by not negotiating longer than they did and ultimately utilizing a method of apprehension that involved direct, physical confrontation of Ogletree and that, as Plaintiff contends, inevitably included using deadly force against Ogletree.

The Seventh Circuit's decision in *Plakas v. Drinski,* 19 F.3d 1143 (7th Cir.1994), relied upon by the *Menuel* panel, is particularly instructive regarding these various arguments. In that case, the police had arrested a suspect on various traffic violations. The suspect was able to escape from an officer's car, flee through a wooded area, get to a house, and arm himself with a fireplace poker. When confronted in that house, the sus-

pect attacked the police who retreated, allowing the suspect to flee again into the woods, where he was confronted in a clearing by several officers, from which further flight was impeded by thick undergrowth. When confronted in this clearing, the suspect made various statements that he wanted to die or to be shot. The suspect then raised his poker in a threatening manner at one of the officers and stepped toward him; that officer shot the suspect, killing him. When the suspect's estate sued the municipality that employed the officer, among other claims, the estate contended that the officers had a duty to use and exhaust all available alternative methods short of deadly force (one officer was armed with an incapacitating chemical spray; and a police dog had been brought to the scene by another arriving officer). In affirming the district court's grant of summary judgment in favor of the Defendant municipality, the Seventh Circuit stated, as quoted by the *Menuel* panel:

> There is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. There are, however, cases which support the proposition that, where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first.

19 F.3d at 1148.

Lastly, the Court would take issue with a characterization pervading Plaintiff's arguments—specifically that the SRT's method of confrontational apprehension was inherently one involving deadly force. Such is simply not the case. The SRT moved in to physically seize Ogletree, intending to use force far from lethal. At that time, Ogletree raised his weapon at the SRT, threatening the use of deadly force against them, in response to which the various officers who did shoot Ogletree used deadly force in defense of themselves, their fellow officers, and the pub-

---

9. Plaintiff asserts that both Plaintiff's and Defendants' experts agree that there existed reasonable non-lethal alternatives to the means employed by the Defendants. Such, however, is a mischaracterization of the testimony of Defendants' expert, who, although admitting of his knowledge of the existence of various non-lethal weapons (e.g, stun guns), opined that none were appropriate for this situation involving an armed individual free to move at will around a rather large open space. (*See* Dkt. 40 at pp. 32–34.)

lic. Ogletree therefore took the action that escalated this event from one involving non-lethal force to one necessitating the use of deadly force.

## V. Defendants' Summary Judgment Motions as to Count IV

■ The Court's subject matter jurisdiction over Count IV, the common law negligence claim under Florida law, is predicated on the supplemental jurisdiction of 28 U.S.C. § 1367(a) (codifying *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). (Dkt. 1 at ¶ 2)(Plaintiff's Complaint). However, supplemental jurisdiction is discretionary,[10] and a district court may decline to exercise jurisdiction under § 1367(a) if "the district court has dismissed a claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130. Plaintiff's federal law claims having been dismissed, the appropriate forum for her Count IV claim is in the courts of the state under whose law the alleged acts and omissions are claimed to be actionable. Therefore, the Court will dismiss Count IV.[11]

## VI. Conclusion

In this case, having examined all of the record evidence exhaustively, the Court concludes that the actions of all the law enforcement personnel involved in this incident generally, and specifically in apprehending Ogletree, were clearly objectively reasonable, and not excessively forceful, under the standard imposed by the Fourth Amendment. Embroiled in a tense standoff with an armed individual, the officers took reasonably prudent actions calculated to defuse this potentially explosive situation for the protection of all involved. Unfortunately, in response to the actions of the suspect, the officers were forced to use deadly force. As noted by the Court in *Plakas*, "Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is

what we mean when we say we refuse to second-guess the officer. Here ... the undisputed facts can lead to but one conclusion, [the] use of deadly force was reasonable given [the circumstances]." 19 F.3d at 1150.

Upon consideration thereof, it is hereby **ORDERED**:

1. As to Counts I, II, and III of Plaintiff's Complaint, Defendants' Motions for Final Summary Judgment (Dkts. 21 & 26) are **GRANTED.**

2. The Clerk is **DIRECTED** to enter judgment in favor of Defendants on Counts I, II, and III.

3. Count IV, Plaintiffs state-law based negligence claim, is **DISMISSED** without prejudice as to both Defendants.

4. The Clerk is **DIRECTED** to close this case.

---

10. *Faucher v. Rodziewicz,* 891 F.2d 864, 871 (11 Cir.1990) (citing *Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130).

11. "If the federal claims are dismissed prior to trial, Gibbs [sic] strongly encourages or even

requires dismissal of the state claims." *Faucher,* 891 F.2d at 871 (citing *L.A. Draper and Son v. Wheelabrator–Frye, Inc.,* 735 F.2d 414 (11 Cir. 1984)).