Artis **MENUEL**, Individually and in his capacity as natural father of Jessie Menuel, Deceased; Bell M. Scandrick, as Personal Representative of the Estate of Jessie Menuel, Deceased, Plaintiffs–Appellees,

v.

The **CITY OF ATLANTA**, J.E. Hughey, D.A. Lester, R.D. Scandrick, Individually and in their official capacity as police officers for the City of Atlanta, Defendants–Appellants.

No. 92–8803.

United States Court of Appeals, Eleventh Circuit.

July 13, 1994.

June D. Green, Overtis L. Hicks Brantley, Amy R. Snell, Office of Atlanta City Attys., Atlanta, GA, for appellants.

Martin L. Fierman, Federal Goetz & Cronkwright, K. Christine Harrelson, Atlanta, GA, Roger J. Martinson, Eatonton, GA, for appellees.

Before ANDERSON and CARNES, Circuit Judges, and MERRYDAY *, District Judge.

MERRYDAY, District Judge:

On July 24, 1989, about 12:30 in the morning, the City of Atlanta police department dispatched two city police officers, D.A. Lester and R.D. Scandrick. The dispatch responded to a "911 emergency" telephone call from Bell Scandrick ("Ms. Scandrick"), the sister of Jessie Menuel ("the decedent"). (Ms. Scandrick and Officer Scandrick are not related.) Requesting emergency assistance, Ms. Scandrick reported that the decedent was behaving violently and erratically.[1] The dispatch was denominated by Atlanta's police as "24 violent," which means "violent and demented."

Promptly upon their arrival, Officers Lester and Scandrick spoke with the decedent's brother, Tommie Menuel, from whom the officers learned that earlier in the evening the decedent had become agitated and had choked Artis Menuel ("Mr. Menuel"), her father, who owns the home to which the

---

* Honorable Steven D. Merryday, U.S. District Judge for the Middle District of Florida, sitting by designation.

1. The decedent had a troubled history. This was the third occasion on which her behavior required police intervention. For example, during a violent episode three years earlier, she attacked her nephew with a basketball trophy. The decedent's sister describes her as "maniacally depressed," for which condition she had received medical care since 1982.

officers were dispatched.[2] Informed that the decedent remained inside the home, the officers walked onto the porch and knocked on the door. The decedent suddenly opened the door and unexpectedly lunged at the two officers, grasping a butcher knife, swinging the knife ominously, stabbing at Officer Scandrick in a "hatchet motion," and finally forcing the officers to retreat from the front door and off the porch. The decedent slammed the front door and withdrew to her father's bedroom, locking the bedroom door from the inside. Apparently some screams or other sounds of distress continued from within the house, causing the officers immediate concern for the safety of the occupants.

Inflamed by the decedent's attack, Officer Scandrick apparently cursed audibly and uttered hostile and intemperate statements alluding perhaps to retribution against the decedent.[3] Certain evidence suggests that the decedent overheard Officer Scandrick's comminations, but all parties agree that after the decedent's retreat to her father's bedroom, the officers gathered outside the bedroom door in a hallway dimly lit by a naked bulb and tried futilely to induce the decedent's surrender.[4]

Faced with the prospect of violence and escalating tension, the officers radioed for supervisory and other support. Sergeant Hughey and Officers Lester and Clark arrived. Members of the Menuel family assured the officers that the decedent was unarmed. Ms. Scandrick recalls her conversation with Sergeant Hughey:

Q: Now, you stated that Sergeant Hughey was asking questions trying to find out what had gone on before he got here. To whom was he talking?

A: Primarily my dad.

Q: Did he say anything to you or ask you any questions?

A: I do recall him asking me who does she listen to best, or who can talk to her easiest.

Q: And what was your response, if any?

A: When she's out of control usually no one.

Sometime after the entry of the police officers into the house and before any gunfire, one or more of the Menuel family asked the police to depart the premises and leave the family to handle the matter privately or with the help of others, including perhaps the DeKalb County sheriff. Officer Lester's account offers important details:

Q: Before you went up to the bedroom door to try and talk her out, before you went up there, I want to find out what you had learned. One, was there were no other weapons in the house, you learned that; is that correct?

A: That's what we were told by the family members.

Q: What else were you told by the family members, anything at all?

A: They wanted us to leave the home. They wanted to handle it themselves. They wanted us to just leave. And at that point, I'm not sure which family member I talked to, I told them that we couldn't leave then at that point because a crime had been committed against an officer.

---

**2.** Ms. Scandrick's deposition confirms that the decedent began breaking dishes, smashing the glass in a china closet, and choking her father. The sudden outburst, although predominantly a symptom of the decedent's chronic mental instability, was catalyzed on that day by no more than a conversation between the decedent and Mr. Menuel about whether a neighbor properly objected to the presence of the Menuels' dog in the neighbor's yard and whether the neighbor's cat deserved reciprocal exclusion from the Menuel's yard.

**3.** Evidence suggests Officer Scandrick said, "That bitch is going down" or "I'm taking her down" or something to that effect. Officer Scandrick claims unimpressively that the phrase was "going downtown." In either event, police jargon for arrest is "take down," which is susceptible to misinterpretation, to say the least. However, in this case, Ms. Scandrick admits that Officer Scandrick told both Mr. Menuel and her that "going down" meant only an arrest.

**4.** The police officers claim that during their pleas for the decedent's surrender, she said something to the effect that, "If you come fucking with me, you're going to have to kill me." Even if not precisely accurate, the tenor of this evidence, the evidence capsulated in footnote 5 and the accompanying text, the event described in footnote 9, and evidence from other sources describes the caustic and dangerous context in which these events occurred.

Q: What did you learn about the perpetrator by these people? Did anybody tell you that she had a mental problem?

A: They stated she had a mental problem, yes.

After some additional consultation, the officers, led by Sergeant Hughey, devised a strategy to capture the decedent. Mr. Menuel consented to the plan, although other family members may have disagreed. The plan was implemented. Officer Miles knocked on the bedroom window, creating a diversion that was calculated to consume the decedent's attention, perhaps to confuse her, and to delay slightly her response at the moment of entry. Officers Hughey, Lester, and Clark penetrated the locked door and entered the bedroom expecting to easily restrain and arrest the decedent. Officer Scandrick stood prepared to heave a vacuum cleaner into the decedent's torso if necessary to stop any aggressive response by her.

As the officers burst through the door into the bedroom, the decedent fired on the four incoming officers with a .25 caliber handgun, which generated a "muzzle flash" five to six feet from Officer Lester in the darkened bedroom.[5] In the next few seconds, three of the officers responded defensively by firing a total of eight essentially simultaneous shots, six of which hit the decedent and killed her. The police's internal investigative report presents a graphic account of the details of this fatal exchange of gunfire:

Officer Miles was at the bedroom window watching the victim until she closed the curtains, he advised Sergeant Hughey of this. Sergeant Hughey, Officers Clark, Scandrick and Lester were in the hall. Officer Scandrick was told to pick up an upright vacuum cleaner and if the victim came out with the butcher knife after Officer Lester kicked the door open to hit her with the vacuum cleaner in the upper body

to take her off her feet so they could subdue her. Officer Miles broke the window and Officer Lester kicked the bedroom door open. The victim fired one or two shots from inside the dark bedroom, the officers in the hall retreated and pulled their weapons. The victim came out into the hall and fired once more. Officer Clark retreated in the bedroom across the hall from the bedroom the victim had locked herself in. One bullet hole was found in the far wall of this bedroom proving the victim fired at or in the direction of Officer Clark when she fired from the bedroom she was in.

Sergeant Hughey retreated into the livingroom, closing the door between him and the victim and firing at her through the door. He fired twice one of his projectiles was stopped by the livingroom door jamb, the other past through the living room door across the hall and was stopped by the wall. This bullet may have struck the victim on the finger of her left hand.

Officers Scandrick and Lester retreated back to the diningroom door. This put them to the front of the victim when she entered the hall and turned on them. The victim fired one shot in the hall. Officer Scandrick returned fire once, Officer Lester who was standing in front of Officer Scandrick returned fire, five [5] shots.

The victim was hit a total of six [6] times, once in the face, once in the head, twice in the chest, once in the left arm and once in the finger of the left hand.

From the positions of the bullet wounds and the positions of the officers, Scandrick and Lester it is obvious the lethal wounds were caused by Officer Lester who fired five shots and Officer Scandrick who fired one shot.

No member of the family was a witness to the shooting.[6]

---

5. The decedent's father explained the presence of the .25 caliber handgun.

Q: Do you know whether or not Jessie knew you had a gun in the room?

A: Well, yeah, quite naturally she did. My kids knows me. These here now, they ain't seen the gun, but they know it's a gun in there somewhere because I'd be stupid running around here, 75 years old, let some of

these teenagers knock me in the head and not having nothing now. I couldn't do it that way.

6. This narrative is part of the original, unedited report, presented here without correction, grammatical or otherwise. Counsel for the Menuel family elected in the appellees' brief to adopt and

In due course, the present action was instituted by Mr. Menuel and Ms. Scandrick against Officers Hughey, Lester, and Scandrick and the City of Atlanta. In those counts pertinent to this appeal, Mr. Menuel and Ms. Scandrick claim (1) that the police officers violated the decedent's Fourth Amendment protection against unreasonable seizure by using unconstitutionally excessive force in seizing her and (2) that the City of Atlanta unconstitutionally maintained an inadequate system of training officers to encounter and control violent and mentally disturbed people.

 The police officers and the City of Atlanta moved for summary judgment on the basis, among others, that no Fourth Amendment violation occurred, even assuming the truth of the assertions by the plaintiffs, and that principles of qualified immunity preclude liability. The district court denied summary judgment.[7] The dispositive issue in this appeal is whether the evidence creates a genuine claim that the shooting and death of the decedent arose proximately from a seizure that impinged her Fourth Amendment rights.

In *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), two police officers pursued a group of youngsters, who were huddled around a parked car and who fled as an unmarked patrol car approached. The parked car departed southerly at high speed and Hodari fled northerly on foot. During the pursuit by the officer, Hodari discarded something similar to a small stone or rock. Momentarily, Hodari was seized and handcuffed. The rock was crack cocaine.

California's appellate court affirmed the trial court's denial of Hodari's motion to suppress, which asserted that the officer seized Hodari contrary to the Fourth Amendment beginning at the moment when the arresting officer ran toward Hodari and caused him to flee. California's affirmance presented squarely the issue of whether and when a seizure occurs during the sequence beginning with suspicion and concluding with arrest. After an interesting etymological inquiry concerning the term "seizure," the Supreme Court affirmed the denial of the motion to suppress and stated:

> The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not.
> .... The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccess-

---

paraphrase this report in lieu of an elongated fact statement.

7. Concluding that an interlocutory appeal would expedite the resolution of this grim and emotional dispute, the district court granted the City of Atlanta's motion for Rule 54(b) certification, explicitly permitting the City of Atlanta to appeal in concert with the police officers, whose appeal in this case is undoubtedly available as a matter of right. Although some uncertainty persists, this court need not decide whether the City of Atlanta's appellate rights depended on an order pursuant to either Rule 54(b) or 28 U.S.C. § 1292(b) or depended solely on the authority of *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In any event, the claims against the City of Atlanta are properly before the court because the circuit court of appeals is vested with jurisdiction to resolve an immediate appeal from an order denying qualified immunity and because the circuit court of appeals retains discretion to exercise pendent jurisdiction over the balance of the action after jurisdiction attaches as to any part of the action. *Courson v. McMillian*, 939 F.2d 1479, 1486 (11th Cir.1991);

*Hudgens v. City of Ashburn, GA*, 890 F.2d 396, 402 (11th Cir.1989); *Stewart v. Baldwin County Board of Education*, 908 F.2d 1499, 1508 (11th Cir.1990).

The standard of review in the circuit court, assuming an appealable denial of summary judgment, is *de novo*, that is, review that substitutes the decision of the circuit court for the decision of the district court, as if the circuit court had resolved the motion in the first instance. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The concept of *de novo* review encompasses with respect to certain cases (including summary judgments) and certain issues (including all issues of law) the appellate judges' unquestioned entitlement to weigh the arguments advanced in the trial court without considering the component of presumptive correctness that often accompanies the trial court's judgment. The concept of *de novo* appellate review includes neither leave to resurrect theories abandoned in the district court nor license to manufacture and feature theories of recovery conceived en route to the circuit court.

ful.... An arrest requires *either* physical force (as described above) *or*, where that is absent, *submission* to the assertion of authority.

(emphasis supplied) 499 U.S. at 624–26, 111 S.Ct. at 1550–51, 113 L.Ed.2d at 697.

The Supreme Court has not resolved a case both applying *Hodari D.* and involving the sort of encircling and impenetrable deployment of police compulsion and authority utilized in the Menuels' home. The decedent was surrounded by overwhelming force and her capture was a mere eventuality, bound probably to occur only at a time and in a manner prescribed and implemented by the police. The decedent had neither means nor opportunity for escape.

As a matter of fact and law, the distinction between a seized person and a person hopelessly subject to confinement, yet untouched and unyielding, is at first instance a very nice distinction indeed. The controlling distinction is probably the police officers' uncertainty about the capability of the confined person (after all, the decedent supposedly possessed no weapon more potent than a knife). From the vantage of an officer whose life is jeopardized, a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death. The potential for the confined person to commit sudden, unexpected, and lethal violence commends the formula in *Hodari D.*, which places the law, as it judges the police, in no better position than the police, as they judge the suspect.

▮ Because the decedent was intransigent and because she neither yielded to physical force (none was applied to her before the fatal shooting) nor submitted to a display of authority (much of which was applied before the shooting), *Hodari D.* compels the conclusion that no seizure, reasonable or unreasonable, occurred before the shooting. In other words, notwithstanding her confinement and encirclement, the decedent exerted deadly force, albeit somewhat suicidal in its prospects, in an attempt to either escape or retaliate—which is to say,

and this court so holds, that until she was shot to death, the decedent was not meaningfully or effectively seized either in the Fourth Amendment sense or in the everyday sense.[8]

▮ The issue remaining for resolution is whether the seizure itself, i.e., the shooting to death of the decedent, was reasonable under the circumstances. In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the diabetic Graham was a passenger in an automobile stopped by a Charlotte, North Carolina, police officer, who observed Graham quickly enter and exit a convenience store. After the automobile was apprehended and while the officer called for a complement of assisting officers, Graham lost consciousness on a nearby curb. Regaining consciousness, Graham asked the officers, who suspected an alcoholic stupor, to note his diabetic's decal. After some unpleasantness, Graham was released, although he sustained orthopaedic and other injuries in the interim. Graham sued under 42 U.S.C. § 1983 and alleged the use of excessive force by the officers. The district court granted a motion for a directed verdict against Graham.

Clarifying a perceived conflict between *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), and *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), concerning whether the Fourth or Eighth Amendment standard applies, the Supreme Court stated:

> Today we make explicit what was implicit in *Garner's* analysis, and hold that all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due pro-

---

8. Because a seizure occurred, the problem presented by *Wilson v. Northcutt*, 987 F.2d 719 (11th Cir.1993), is not germane.

cess," must be the guide for analyzing these claims.

490 U.S. at 395, 109 S.Ct. at 1871.

The Supreme Court evaluated more precisely the particulars of its chosen standard and provided helpfully specific guidance:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. (citations omitted) The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. (citations omitted) An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

490 U.S. at 396–97, 109 S.Ct. at 1872. *See also Scott v. United States,* 436 U.S. 128, 137–39, 98 S.Ct. 1717, 1723–24, 56 L.Ed.2d 168 (1978).

In this tragic case, the shooting to death of the decedent occurred in response to her discharging a .25 caliber pistol aimed toward a police officer at close range in a darkened room. The officers forcefully entered the bedroom because they believed the decedent was either unarmed or carried only a knife. The officers fired and retreated, probably in momentary disarray, because, as they entered the bedroom, they believed the dece-

dent was either unarmed or carried only a knife. Obviously, Officer Miles would not have tapped on the bedroom window and offered his face as a target highlighted by a flashlight if he thought the decedent carried a gun. Obviously, Officer Scandrick would not have stood nearby with a vacuum cleaner in his hands if he suspected the onset of gunfire. The officers proceeded slowly, cautiously, and precisely, resorting to deadly force only when assaulted with deadly force.[9] Nothing about the quantity or delivery of the force suggests "objectively unreasonable" police conduct. Consideration of these facts in conjunction with governing interpretations of the Fourth Amendment compels the conclusion that the police officers lawfully approached and entered the Menuel home; the police officers lawfully pursued the decedent after evading her knife attack; the police officers, proceeding with the knowing consent of the decedent's father, lawfully devised a plan to subdue and arrest the decedent; and, sad to say, the police officers fatally but lawfully shot the decedent in response to her continuing gunfire. In sum, the officers seized the decedent by shooting her but, in the circumstances of this case, violated none of her Fourth Amendment rights as a result.

This conclusion accords comfortably with the opinion of Judge Zagel in *Plakas v. Drinski,* 19 F.3d 1143, 1148–50 (7th Cir.1994), in which he states:

> There is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. There are, however, cases which support the assertion that, where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use nondeadly alternatives first. . . .

> The Fourth Amendment does not require officers to use the least intrusive or

---

9. Sometime before the shooting of the decedent but after the confrontation between the decedent and Officers Scandrick and Lester on the porch of the Menuel home, Mr. Menuel emerged, understandably startled, from his bedroom. He carried a shotgun, which he aimed at the officers and into which he chambered a shell within the officers' hearing. Responding cautiously, the officers and family members persuaded Mr. Menuel that he was not threatened by the disturbance he had heard. The police officers, confronted with a shotgun at close quarters, took no unusual or aggressive action, which attests tellingly to their moderation even when acting *in extremis.*

even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable.

. . . .

... Nearly every court has commented on [the] fact that all decisions about deadly force (or any force) "must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain and rapidly evolving." (citation omitted) We always judge a decision made ... in an instant or two. It is true we consider the whole of the event as it appears to the officer involved, but we recognize that the decision to shoot can only be made after the briefest reflection, so brief that "reflection" is the wrong word....

. . . .

Our historical emphasis on the shortness of the legally relevant time period is not accidental. The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

... Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer.

On the night of the events that prompted this lawsuit, a crime was committed against Officer Scandrick. Another crime probably had been committed against, at least, Mr. Menuel. As ably iterated by Judge Zagel, police must pursue crime and constrain violence, even if the undertaking itself causes violence from time to time. No responsible officer could disregard the palpable indications of imminent violence that pervaded the Menuel household. In effect, the officers merely substituted themselves for innocent bystanders and untrained and vulnerable family members as prospective objects of the decedent's violent exertions. Had the officers deserted the family under the circumstances of this case, another lawsuit might have resulted, but the allegations, perchance equally or more tragic and evocative, might have differed only by the number, identity, or defenselessness of the deceased, dead at the hand of a disturbed and episodically violent person.

The actions of the officers in this case were neither objectively unreasonable nor offensive to the Fourth Amendment. Because the absence of an underlying Fourth Amendment violation supersedes the issues of qualified immunity and municipal liability, the district court's order denying the motion for summary judgment by the City of Atlanta and the police officers is REVERSED, and this action is REMANDED for further proceedings in accordance with this opinion.