HULL, Circuit Judge,
joined by TJOFLAT, Circuit Judge, concurring in the denial of rehearing en banc:
A majority of the Court has voted not to rehear en banc the panel’s non-published, and thus non-precedential, decision. The district court entered a thorough (44-page) order granting qualified immunity to the defendant, Deputy Sylvester, in this § 1983 police-shooting case. In its summary decision, the panel found “no reversible error” in the district court’s qualified immunity rulings, stating in full:
After review of the record and with the benefit of oral argument by counsel for the parties, this Court finds no reversible error in the district court’s September 18, 2014 order (1) granting defendants Sheriff Gary S. Borders and Deputy Richard Sylvester’s motion for summary judgment with respect to all of plaintiffs Amy Young, John Scott, and Miranda Mauck’s 42 U.S.C. § 1983 claims against Sheriff Borders, in his official capacity as Sheriff of Lake County, Florida,' and Deputy Sylvester, in his individual capacity, and state law claims for wrongful death of the decedent, Andrew Scott, assault of Mauck, and false imprisonment of Mauck, and (2) denying plaintiffs Young, Scott, and Mauck’s motion for partial summary judgment with respect to their § 1983 claims against defendant Borders. We echo the district court’s expression of *1275 sympathy for the plaintiffs’ loss, but while the facts of this case are tragic, we can find no reversible error in the district court’s ultimate qualified immunity rulings. Accordingly, we must affirm the district court’s final judgment in favor of the defendants on all of plaintiffs’ claims.
This case is not en-banc worthy because the panel’s decision is correct and establishes no circuit precedent.
Although orders denying rehearing en banc also have no precedential effect, our colleagues have written two lengthy dissents to this order denying rehearing en banc. Two of the original panel members now write to explain the errors in those dissents.
First, although the district court ruled that Deputy Sylvester’s conduct violated no “clearly established law” as of July 15, 2012, the dissents fail to identify any cases with facts similar to the undisputed facts here, much less any similar cases where an officer was held to have violated the Fourth Amendment. See White v. Pauly, 580 U.S. -, -, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam) (admonishing that, in qualified immunity cases, “clearly established law should not be defined at a high level of generality,” “must be ‘particularized’ to the facts of the case,” and must give “fair and clear warning” to officers that their conduct is unlawful under the Fourth Amendment).
Second, the dissents omit key, undisputed facts in their recitations of what defendant Deputy Sylvester saw, was told, and then did on this night when he tragically shot and killed Mr. Scott, an innocent young man. Here are the complete facts that show what happened that summer night and why the panel properly found no reversible error in the district court’s qualified immunity ruling.
I. FACTUAL BACKGROUND
We review an order granting summary judgment de novo, viewing the facts of the case in the light most favorable to the party opposing the motion. Vinyard v. Wilson, 311 F.3d 1340, 1346 n.7 (11th Cir. 2002). We therefore recite the facts in the light most favorable to the plaintiffs, even though the defendants dispute the plaintiffs’ version of the events. Id. at 1343 n.1.[1]
A. After Chasing a Motorcycle Speeding at 90 mph, Deputy Sylvester Finds the Still-Hot Motorcycle in Front of Apartment 114 (where Mr. Scott Resided).
Sometime after 1:00 a.m. on July 15, 2012, defendant Deputy Sylvester was in his squad car and spotted a motorcycle driving upwards of 90 mph, well in excess of the posted speed limit. After making a U-turn to pursue it, Deputy Sylvester maintained sight of the motorcycle and watched it race down U.S. 441 before turning left onto County Road 44. Sylvester followed, also turning onto 44. He soon lost sight of the motorcycle.
Deputy Sylvester radioed dispatch to report that he had pursued and lost sight of the motorcycle. Sylvester reports that dispatch advised the motorcyclist might be the same person being sought by the Lees-burg Police Department and he might have a pistol. Shortly thereafter, Sylvester received a radio message from Corporal David McDaniel reporting that he had “probably located the motorcycle at the Blueberry Hill apartments.”
*1276 Corporal McDaniel had heard Deputy Sylvester’s report about the speeding motorcycle and checked out a few places in the Leesburg area. One place was the Blueberry Hill apartment complex located about a mile from where Sylvester originally spotted the 90 mph speeding motorcycle. When McDaniel pulled into the complex, McDaniel noticed a parked motorcycle and could “hear the motorcycle’s motor still popping and crackling because it was hot.” McDaniel notified Sylvester of his discovery.
Contemporaneously, Deputy Joseph Brocato, who was five miles away from Blueberry Hill, overheard on the Lees-burg police radio channel that a “motorcycle had fled from them and the matter also involved an assault and battery with a loaded firearm.” Brocato heard that the Leesburg police had lost the motorcycle and had called off the pursuit. Brocato then heard Sylvester’s report of a speeding motorcycle, and, given their physical proximity, Brocato wondered if both reports involved the same motorcycle. Shortly thereafter, Brocato overheard Corporal McDaniel’s message about the motorcycle at Blueberry Hill. Brocato went to the Blueberry Hill complex where McDaniel was. When he arrived, Brocato “looked at the motorcycle,” and “[i]ts engine was still hot.”
After receiving Corporal McDaniel’s message, Deputy Sylvester drove to Blueberry Hill. As he pulled into the complex, McDaniel and Deputy Brocato were already there, and Sylvester identified the suspect motorcycle as the one he had pursued and lost earlier. Sylvester said “[t]he motorcycle’s engine was still warm, as was the headlight.”
In his deposition, Deputy Sylvester was asked: “Were you able to positively identify that motorcycle as the motorcycle that had sped past you earlier?” Deputy Sylvester answered “Yes, sir.” Deputy Sylvester also said that, while he could not identify the make and model, it was a dark-colored bike and “it was a sport-bike.”
A fourth officer, Deputy Lisa Dorrier, arrived after hearing the motorcycle reports. Once gathered, Deputy Brocato shared with the group the radio reports about the Leesburg police’s pursuit of a motorcyclist who was possibly armed.
In sum, the still-hot motorcycle parked in front of Apartment 114 appeared to be (1) the same 90 mph speeding motorcycle Deputy Sylvester had pursued and (2) the same motorcycle, as the Leesburg police had warned, of an armed suspect involved earlier in an assault and battery incident. These facts — about how and why the officers arrived at the motorcycle parked directly in front of Apartment 114 where Mr. Scott resided — are not disputed.
B. Officers Focus Attention on Apartment 114.
Next to the still-hot motorcycle, the officers noticed a Chevy TrailBlazer SUV. Corporal McDaniel ran the motorcycle’s license tag number through the DAVID database and learned that the motorcycle was registered to “Jonathan Brown” at an address in Mount Dora, Florida/After running the Chevy’s tag number, McDaniel learned that the Chevy was also registered to Brown at the same' Mount Dora address. Deputy Brocato ran the license tag information too and learned that both the Chevy and the motorcycle were registered to Brown. Although the Blueberry Hill complex was not in Mount Dora, both vehicles were registered to the same owner and parked side-by-side in front of Apartment 114.
Record photos show Apartment 114’s exterior and the motorcycle and the Chevy parked near Apartment 114.
*1277 [[Image here]]
The officers noticed lights illuminated inside of Apartment 114 but not in nearby apartments. Deputy Sylvester observed a fresh footprint in the sand next to the motorcycle leading toward 114. Other officers do not recall seeing a footprint.
The officers decided to knock on doors in the complex, starting with Apartment 114, to try to' gather information about the owner of the motorcycle. The officers could not be certain whether the armed motorcyclist was in 114 or in a different apartment since they knew that the complex did not have assigned parking. The officers stated that the occupants were not suspects. Nonetheless, believing the man they were pursuing might be armed and might be in 114, the officers took “tactical positions” around the front door of 114 before knocking.
The uniformed officers parked their four patrol vehicles in plain view outside Apartment 114. There was a front window next to the front door of 114.
C. Officers Took Reasonable Safety Precautions
The officers’ positions, before Deputy Sylvester knocked on the door to Apartment 114, are not disputed. Deputy Sylvester positioned himself to the left of the front door, near the exterior wall. Sylvester states that “[f]rom there, [he] could see whoever opened the door and they could see [him].” The front door is hinged on the left side of the doorframe and opens inward. Sylvester stood only a few feet from the front door — not on the stoop, but on the ground to the left of the stoop. Sylvester stood in a clear line of sight of anyone who might open the door. He held an illuminated “blue light” flashlight. Corporal McDaniel stood to the right of the front door with his right shoulder touching the exterior wall.
As the photo shows, a short privacy fence separates Apartment 114 from Apartment 115. Deputies Brocato and Dor-rier stood in front of 115 on the other side of the fence separating them from Deputy Sylvester. Brocato could see only Sylves *1278 ter’s head over the fence. Other officers also held lit “blue light” flashlights.
Although only two,of the four officers were in front of Apartment 114 as they took their positions, all four officers had their guns drawn. Notably, Deputy Sylvester held his gun behind his leg and prepared to knock. Sylvester states that he did not announce that he was with the Sheriffs Office because he was planning to try to speak with the occupants to see if he could obtain any information about the suspect, owner of the motorcycle parked out front.
Deputy Sylvester began knocking on the front door of Apartment 114. Viewed in the light most favorable to the plaintiffs, these were loud knocks. A neighbor remembers that an officer “banged” on the door “just three times, just boom, boom, boom.” Mr. Scott and Plaintiff Mauck (his girlfriend) were inside the lit Apartment 114. Mauck testified that the knocking sounded like “bang, bang, bang; wait; and then bang, bang, bang.” Mauck described the knocks as “scary” and “very startling.”[2]
A resident inside Apartment 115 (next door) heard the knocking and opened his front door before Mr. Scott, in Apartment 114, opened his door. Deputy Dorrier re-holstered her gun, went to 115’s front door, and told the resident that the officers were looking for the owner of the motorcycle. Dorrier reports that “[t]he man gestured with his right hand towards the building to his right and said, ‘He lives over there.’ ”
Deputy Sylvester overheard a portion of this conversation and remembers hearing the resident say, “He lives over there.” This gave Sylvester the impression that the armed motorcyclist might be inside Apartment 114, although Sylvester did not see in which direction the resident pointed. Upon Deputy Sylvester’s hearing “He lives over there,” Sylvester saw 114’s door suddenly open. The next events unfolded in a few seconds.
D. Deputy Sylvester’s Split-Second Decision
Everyone agrees that the occupant, Mr. Scott, opened the door with a gun in his hand. Deputy Sylvester says the gun was pointed directly at him, but Plaintiff Mauck says Mr. Scott held his gun down by his side. We must credit the plaintiffs’ version of events. Thus, only the fact that Mr. Scott held a gun and was only a few feet from Sylvester is undisputed. No one, however, contradicts Sylvester’s testimony that Mr. Scott, with a gun in hand, moved and began backing away behind the door in a sudden movement that Sylvester perceived as an attempt to edge back and take cover “so he could fire on me.”
The entire incident at the door took about two seconds. Although knocking to gather information, Deputy Sylvester then saw an occupant open the door with a gun and appear to move to fire, and Sylvester then made a split-second judgment that the person was the armed motorcyclist and presented an immediate danger of serious bodily harm. In mere seconds, this investigatory action turned tragic as Sylvester shot and killed Mr. Scott, an innocent young man who was not the motorcyclist.
II. EXCESSIVE FORCE ANALYSIS
The district court emphasized the unsettling and difficult nature of this case:
The facts giving rise to Plaintiffs’ claims present a tragic story. As is oftentimes *1279 true, viewing present circumstances through the unforgiving lens of hindsight is unsettling because it is easy to focus on the innumerable and imaginary “what if’ scenarios. This case is no exception; any number of events in this case could have gone differently, even however so slightly, which may have avoided the sad and unfortunate death of Andrew Scott. However, as discussed more fully below, the legal analysis is not so simple.
Young v. Borders, No. 5:13-CV-113-OC-22PRL, 2014 WL 11444072, at *2 (M.D. Fla. Sept. 18, 2014). The district court’s legal analysis follows.
A. Objective Reasonableness Test
There is no question Deputy Sylvester subjectively perceived an imminent threat of serious bodily harm. But the proper legal inquiry is an objective one. The district court recognized that the only relevant question is whether a police officer in this same situation could have reasonably and objectively perceived this person with a gun as posing an immediate threat of serious bodily harm.
A Fourth Amendment seizure occurs when a police officer uses excessive force against a person. Scott v. Harris, 550 U.S. 372, 381, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). An officer may use deadly force against only a person whom an officer reasonably perceives as posing an imminent threat of serious physical harm to the officer or others. Robinson v. Arrugueta, 415 F.3d 1252, 1256 (11th Cir. 2005); McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003). Reasonableness depends on all the circumstances relevant to an officer’s decision to use force and the amount of force used. McCormick, 333 F.3d at 1246. “The ‘reasonableness’ of a particular use of force must be judged from the perspective of a reasonable officer on the scene” and the inquiry “is an objective one.” Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Thus, the district court properly viewed the circumstances from the perspective of a reasonable officer on the scene at Apartment 114.
Because “[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,” its proper application also “requires careful attention to the facts and circumstances of each particular case.” Graham, 490 U.S. at 396, 109 S.Ct. at 1872 (internal quotation marks omitted). In its order, the district court recited the facts at length and properly “analyz[ed] the totality of the circumstances.” Plumhoff v. Rickard, 572 U.S. -, -, 134 S.Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014).
B. Objective Reasonableness of Deputy Sylvester’s Split-Second Decision
Based on the total circumstances that led Deputy Sylvester to knock on the 114 door, the district court concluded that a police officer, with Sylvester’s knowledge, could have reasonably perceived in that split-second (1) that the person who opened the 114 door with a gun in his hand was the reported armed motorcyclist, (2) that the person’s sudden movement — backing and edging behind the door — was an attempt to take cover to fire, and (3) that the person thus posed an imminent “threat of serious physical harm” to Sylvester. See Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013) (quoting McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009)). This is because a reasonable officer in Sylvester’s position, facing the occupant holding a gun, already would have known the following: (1) there were police reports of an armed motorcyclist in the area who recently was involved in a violent incident; (2) Sylvester had just pursued, but lost *1280 sight of, a 90 mph speeding motorcycle in the same area; (3) Sylvester and his fellow officers located a similar motorcycle nearby in front of Apartment 114 that was recently driven and still hot; (4) this motorcycle was parked next to a Chevy registered to the same person; (5) the motorcycle’s armed driver had presumably gone into a nearby apartment right before the officers arrived; (6) only one of the nearby apartments had lights on, and that was 114, the one directly in front of the still-hot motorcycle and Chevy; and (7) the occupant of Apartment 115 next door answered and said, “He lives over there.”
The district court reasoned that it “must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a spliUsecond decision between action and inaction in circumstances where inaction could prove fatal.” Young, 2014 WL 11444072, at *14 (quoting Crosby v. Monroe Cty., 394 F.3d 1328, 1334 (11th Cir. 2004)); see also Jean-Baptiste v. Gutierrez, 627 F.3d 816, 820-21 (11th Cir. 2010). These types of split-second decisions occur “in circumstances that are tense, uncertain, and rapidly evolving,” Graham, 490 U.S. at 397, 109 S.Ct. at 1872.
Importantly, the district court concluded that this was not just Sylvester’s subjective belief but an objectively reasonable perception of an officer on the scene. The district court concluded that Sylvester was not required to wait and see what might happen if he did not stop Mr. Scott, citing Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007) (“[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.”). The district court concluded that Deputy Sylvester’s split-second decision to use deadly force was objectively reasonable under the total circumstances — a reasonably perceived imminent threat of serious physical harm — and was not a constitutional violation.
III. QUALIFIED IMMUNITY
’ Although the district court ruled on the constitutional violation issue, our panel did not need to decide it. This is because the district court also concluded that “[e]ven if ... Sylvester violated Scott’s constitutional rights ... by using excessive force, Sylvester would be entitled to qualified immunity because he violated no clearly established right,” Young, 2014 WL 11444072, at *18. The panel simply and correctly found “no reversible error in the district court’s ultimate qualified immunity rulings.” At a minimum, no clearly established federal law as of July 15, 2012[3] gave fair and clear notice to Deputy Sylvester that his conduct in these unique circumstances was objectively unreasonable and unlawful, and thus “no reversible error” was shown. We explain why the district court did not err on the clearly established prong.
A. Fair Notice Requires Prior Cases with Particularized Facts.
“Qualified immunity attaches when an official’s conduct ‘does not violate clearly, established statutory or constitutional rights of which a reasonable person would have known.’ ” White, 580 U.S. at -, 137 S.Ct. at 551 (quoting Mullenix v. Luna, 577 U.S. -, -, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam)). In the last five years, the Supreme Court has *1281 issued a number of opinions reversing federal courts that denied qualified immunity, often because they applied the clearly established analysis at too high a level of generality and without regard to the particular facts of prior case law. See id.; see also City & Cty. of San Francisco v. Sheehan, 575 U.S. —, -, 135 S.Ct. 1765, 1774 n.3, 191 L.Ed.2d 856 (2015) (collecting-cases). The Supreme Court “found this necessary both because qualified immunity is important to ‘society as a whole,’ and because as ‘an immunity from suit,’ qualified immunity ‘is effectively lost if a case is erroneously permitted to go to trial.’ ” White, 580 U.S. at -, 137 S.Ct. at 551-52 (quoting Sheehan, 575 U.S. at - n.3, 135 S.Ct. at 1774 n.3, and Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)).
In White, the Supreme Court reiterated “the longstanding principle that ‘clearly established law’ should not be defined ‘at a high level of generality.’ ” Id. at -, 137 S.Ct. at 552 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011)). The Supreme Court explained that federal courts that relied on Graham, Garner, and their circuit court progeny, instead of identifying a prior case with similar circumstances, have “misunderstood” the “clearly established” analysis because those excessive force cases do not create clearly established law outside of an “obvious case”:
The panel majority misunderstood the “clearly established” analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment. Instead, the majority relied on Graham, Garner, and their Court of Appeals progeny, which — as noted above — lay out excessive-force principles at only a general level. Of course, “general statements of the law are not inherently incapable of giving fair and clear warning” to officers, United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), but “in the light of pre-existing law the unlawfulness must be apparent,” Anderson v. Creighton, supra, at 640. For that reason, we have held that Garner and Graham do not by themselves create clearly established law outside “an obvious case.” Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam); see also Plumhoff v. Rickard, 572 U.S. -, - [134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056] (2014) [ ] (emphasizing that Garner and Graham “are ‘cast at a high level of generality’ ”).
Id. Like White, “[t]his is not a case where it is obvious that there was a violation of clearly established law under Garner and Graham” because “this case presents a unique set of facts and circumstances,” which is “an important indication” that Deputy Sylvester’s “conduct did not violate a ‘clearly established’ right.” Id. With the help of hindsight, the dissents impermissi-bly second-guess Sylvester’s split-second decision to use deadly force. The dissents define clearly established federal law at too high a level of generality, in contravention of the Supreme Court’s precedent requiring a case with particularized and similar factual circumstances in order to create “clearly established” federal law.[4]
*1282 As the Supreme Court explained decades ago, “the clearly established law must be ‘particularized’ to the facts of the case.” Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). For that reason, “[a] clearly established right is one that is ‘sufficiently clear that every reasonable official would have understood that what he is doing violates that right.’” Mullenix, 57 U.S. at -, 136 S.Ct. at 308 (emphasis added) (quoting Reichle v. Howards, 566 U.S. 658, -, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012)); see also Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012).
The Supreme Court has also explained: “We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.” Mullenix, 57 U.S. at -, 136 S.Ct. at 308 (quotation marks omitted). Although identical facts are not required, there still must be particularized facts that made clear to Deputy Sylvester that his force action was unlawful. “This exacting standard ‘gives government officials breathing room to make reasonable but mistaken judgments’ by ‘protectfing] all but the plainly incompetent or those who knowingly violate the law.’ ” Sheehan, 575 U.S. at -, 135 S.Ct. at 1774 (quoting Ashcroft, 563 U.S. at 743, 131 S.Ct. at 2085).
Again, qualified immunity may be denied only when the officers have “fair and clear warning of what the Constitution requires.” Sheehan, 575 U.S. at -, 135 S.Ct. at 1778. Even before White, this Court recognized that this “critical inquiry” about “fair warning” “must be undertaken in light of the specific context of the case, not as a broad general proposition.” Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) (quotation marks omitted). “Such specificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.” Mullenix, 57 U.S. at -, 136 S.Ct. at 308 (alteration accepted) (quotation marks omitted).
B. No Clearly Established Federal Law Gave Fair Notice.
Here, the panel was required to find “no reversible error” because there is no prior case with facts remotely similar, much less particularized facts similar, to the facts in this case. More importantly, even the contours of the law in this type of unusual factual situation were not sufficiently clear such that a reasonable officer, in Defendant Sylvester’s situation, would understand that what he is doing violates clearly established federal law.[5]
In its clearly established analysis, the dissent relies on our decisions in Lundgren v. McDaniel, 814 F.2d 600, 602 (11th Cir. 1987) and Menuel v. City of Atlanta, 25 F.3d 990 (11th Cir. 1994). The dissent claims that these two cases establish a *1283 “straightforward line” that police cannot shoot people merely because they have a gun in their own home. Martin, J. dissenting at 1294. Of course, that ignores the critical events that led Deputy Sylvester to the door of Apartment 114 and what happened when the door opened. The dissent also says that Lundgren and Menuel involved “circumstances closely resembling this case.” Id. at 1292. This is inaccurate because those cases have materially different facts.
In Lundgren, law enforcement officers walked by a store and saw a broken window. Suspecting a burglary, they entered the store without announcing themselves. 814 F.2d at 602. In Lundgren, unlike this ease, there was no advance report that a burglary suspect in the store might have a gun, much less an advance report of a speeding motorcyclist involved in an assault and battery with a loaded firearm. Id. Upon entry, the officers in Lundgren instantaneously shot the storeowner who, after hearing the officers in his store, rose up from behind his desk where he had been sleeping. Id.
In Lundgren, there was even conflicting testimony about whether the storeowner had a gun. The officers testified that they saw a man with a pistol in his hands. The storeowner’s wife, who was with him, gave conflicting testimony about whether or not the storeowner had reached for his gun but said that the storeowner “never really had a chance to get up off the floor.” Id. Indeed, the forensic evidence showed that the bullet that struck the storeowner in the head had first passed through the desk. Id.
This Court reviewed that conflicting evidence from the Lundgren trial and concluded that, based on the evidence, the “jury could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather that the officers without provocation shot at a nondangerous suspect.” Id. at 603. We thus held that shooting a non-threatening suspect was an unreasonable seizure that was clearly established, and we denied qualified immunity. Id.
No jury is needed here to decide if a storeowner reached for a gun or not. It is undisputed Mr. Scott held a gun when he opened the door and was in full view of Deputy Sylvester. The officers here knocked on the door first and did not enter into a store unannounced. The officers also had reason to think that the motorcyclist may be inside Apartment 114 and may be armed and dangerous. This reasonable suspicion was seemingly verified when Mr. Scott opened the door with a gun in his hand and began moving in a manner reasonably perceived as an attempt to take cover to fire. If anything, Lundgren is inapposite here.
The dissent’s second case is Menuel, where officers shot a girl after she fired at them.[6] 25 F.3d at 993. Given that the girl shot first, this Court concluded that the officers’ actions were objectively reasonable and that no Fourth Amendment violation occurred. Id. at 997. While the Menuel officers took fire before shooting, nothing in Menuel states, much less holds, that officers must wait to be fired upon before using deadly force. Menuel provides little guidance on whether an officer may rea *1284 sonably believe the use of deadly force is justified when the person reportedly has been in a prior armed altercation, has a gun, and moves as if to take cover to fire.
Taken together, what these two prior cases (cited by the dissent) do illustrate is the wide variety of difficult and complex facts in excessive force cases. These two cases, however, do not closely, or even similarly, resemble the facts of this case, which means qualified immunity protects Deputy Sylvester. See Mullenix, 57 U.S. at -, 136 S.Ct. at 312 (“Even accepting that these circumstances fall somewhere between the two sets of cases ... qualified immunity protects actions in the ‘hazy border between excessive and acceptable force.’ ”) (quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004)). Nor do these two cases put Sylvester on “fair notice” that the use of deadly force in this factual situation violated the Fourth Amendment. This is a difficult and unique case that is not answered by either our precedent or Supreme Court precedent. To find Sylvester’s use of force objectively unreasonable, that conclusion must “follow immediately” from the principles of our past precedents. Mullenix, 57 U.S. at -, 136 S.Ct. at 309. That is not the case here.
The panel’s unpublished, non-prece-dential affirmance of the district court’s qualified immunity ruling is not incongruous with this Circuit’s precedent in excessive force cases. En banc consideration is thus not necessary to “maintain uniformity of the court’s decisions” under Federal Rule of Appellate Procedure 35. Fed. R. App. P. 35(a)(1).
IV. “SEARCH” THEORY OF FOURTH AMENDMENT LIABILITY
Even if qualified immunity attaches to the excessive force claim, the dissent alternatively argues that the plaintiffs’ “search” claim should go to trial. That search claim alleges that Deputy Sylvester’s conduct before Mr. Scott opened the door amounted to a “warrantless raid and search” of Mr. Scott’s home that violated the Fourth Amendment.
Recognizing the “sanctity of the home” from government intrusion, the district court determined that Deputy Sylvester’s approach to the door and knocking were lawful under the knock and talk rule. Under Supreme Court precedent, the knock and talk rule permits the police to enter onto private land and knock on a citizen’s door for legitimate police purposes, such as gathering information in an investigation. See Florida v. Jardines, 569 U.S. —, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). We need not decide whether Deputy Sylvester’s conduct before the door opened violated the Constitution because no clearly established federal law gave Sylvester fair and clear notice that his conduct constituted an illegal search.
A. Warrantless Entry into the Curti-lage of a Home
In this case, Deputy Sylvester stood on the ground immediately surrounding the stoop to Apartment 114 as he knocked on the front door. Under a Fourth Amendment analysis, Sylvester entered the curti-lage of Mr. Scott’s home without a warrant, and his conduct at the door took place in a constitutionally protected area. Jardines, 569 U.S. at -, 133 S.Ct. at 1415 (instructing that the area “surrounding and associated with the home” — the curtilage — is “part of the home itself for Fourth Amendment purposes” and that a “front porch is the classic exemplar of an area ... to which the activity of home life extends”). The question becomes whether his conduct fell within the knock and talk exception to a warrantless search. We out *1285 line that exception and how the district court applied it.
B. Knock and Talk Exception
In Florida v. Jardines, the Supreme Court reaffirmed the knock and talk exception, stating that a police officer “not armed with a warrant” still enjoys an implied license to knock on an individual’s door in order to gather information related to the officer’s investigation. Id. at -, 133 S.Ct. at 1416; see also Kentucky v. King, 563 U.S. 452, 469, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011) (stating that a police officer “not armed with a warrant” may approach a home and knock). “This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.” Jardines, 569 at -, 133 S.Ct. at 1415. “The mere purpose of discovering information in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment.” Id. at - n.4, 133 S.Ct. at 1416 n.4 (quotation marks and citations omitted). Thus, “it is not a Fourth Amendment search to approach the home in order to speak with the occupant.” Id.
The scope of this knock and talk exception is limited in two respects. United States v. Walker, 799 F.3d 1361, 1363 (11th Cir. 2015), cert. denied, - U.S. -, 136 S.Ct. 857, 193 L.Ed.2d 721 (2016). First, “the exception is geographically limited to the front door or a ‘minor departure’ from it.” Id. Second, the exception does not apply where the objective purpose of the officer’s behavior is “to do nothing but conduct a search.” Jardines, 569 U.S. at - n.4, 133 S.Ct. at 1416 n.4.
In Jardines, the police officer did not approach and knock on any door. Id. at -, 133 S.Ct. at 1413. Rather, based on a tip about marijuana growing inside the home, the officer went to the home to obtain evidence. To do that, the officer brought a drug-sniffing dog to the defendant’s home and had it sniff around the front porch and the base of the front door, where the dog indicated a positive alert for narcotics. Id
The Jardines officer applied for and received a search warrant based on the evidence of the dog’s positive alert. Id The problem with the officer’s conduct was that taking a trained drug-sniffing police dog to explore the porch and area around the home to obtain the incriminating evidence “objectively reveal[ed] a purpose to conduct a search” of the porch. Id. at -, 133 S.Ct. at 1417. The officers did “nothing but conduct a search” and thus violated the Fourth Amendment. Id. at -, - n.4, 133 S.Ct. at 1416-18, 1416 n.4.
C. Approaching and Knocking on 114’s Door
In stark contrast to Jardines, the officers here did not snoop around the house, peer into the windows, or take any other steps to collect evidence. Instead, Deputy Sylvester approached the plaintiffs’ apartment, stayed at the front door, and knocked. Sylvester did not stand on the steps or the stoop, but rather stood on the ground to the left of the door. He knocked to seek information about and locate the owner, albeit possibly armed, of the still-hot motorcycle parked out front by talking to the residents of Apartment 114. The district court considered all of the conduct at the door, reasoning as follows:
Although the officers in this case positioned themselves in front of the only exit to Apartment 114 with their guns drawn, the LCSO officers did not order Scott or Mauck out of their apartment. As discussed previously, there is no evidence to show that Scott or Mauck even knew that the officers had their guns *1286 drawn. Further, there is no evidence presented ... to show that the officers would not have permitted Scott or Mauck to stay in Apartment 114; to the contrary, the unrebutted testimony in this case is that the officers would have been required to leave if nobody answered the door. The only activity outside of the apartment that Scott and Mauck knew of was that someone had knocked on their door loudly. As discussed above, this is not such a “show of authority” that would permit Scott and Mauck to believe they would not have been permitted to stay inside their apartment.
Young, 2014 WL 11444072, at *11. The district court thus determined that Sylvester’s conduct before the door opened fell squarely within the knock and talk exception and did not violate the Fourth Amendment.[7]
D. No Clearly Established Federal Law
Once again, we need not decide the constitutional violation issue. At a minimum, no clearly established federal law on July 15, 2012 gave fair and clear notice to Sylvester that his conduct before the door opened was an illegal search.
“Our Court looks only to binding precedent — cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose — to determine whether the right in question was clearly established at the time of the violation.” Coffin, 642 F.3d at 1013. In doing so we also only look at the state of the law on the date of the challenged conduct. Hope, 536 U.S. at 741, 122 S.Ct. at 2516. “Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.” Brosseau, 543 U.S. at 198, 125 S.Ct. at 599. The dissent does not cite any Supreme Court, binding Eleventh Circuit, or Florida Supreme Court case that would have put Deputy Sylvester on fair and clear notice that the time and manner of his approach on July 15, 2015 was illegal.
Instead, relying on cases from other circuits, the dissent argues that it is clearly established federal .law that Deputy Sylvester’s behavior was “a raid” and exceeded the scope of the permissible knock and talk exception because it was 1:30 a.m., he unholstered his weapon, and he knocked so loudly. In those cases, however, the officers made warrantless entries using a coercive show of force. In contrast, the officers’ actions here are dissimilar and do not rise to the level of a “show of force” found impermissible in those other cases.
For example, in United States v. Gomez-Moreno, the officers attempted a “knock and talk” at a suspected stash house for illegal aliens. 479 F.3d 350, 352-53 (5th Cir. 2007).[8] Ten to twelve armed officers drove to the residence, formed two groups (one for each of the two houses at the location), surrounded both houses, and *1287 had a helicopter hovering overhead. Id. at 352, 355. At the front house, no one answered, so the officers checked the doorknob to see if it would open. Simultaneously at the back house, officers announced their presence and demanded that the occupants open the door. Id. The Fifth Circuit concluded that the knock and talk strategy was unreasonable because “the officers made a show of force, demanded entrance, and raided the residence.” Id. at 356.
In contrast, Deputy Sylvester did not even check the door knob, did not demand the door be opened, and did not have a helicopter hovering overhead. In addition, the lateness of the knock on Mr. Scott’s door did not make Sylvester’s actions “a raid” because the lights were on in the apartment. See Walker, 799 F.3d at 1364 (finding that, at five in the morning before sunrise, the officers were not unreasonable in approaching a car parked in the carport because the lights in the house and in the car were both on). The dissent does not dispute the lights were on and even points out that the occupants were still up and playing video games.
Rather, the dissent claims that Mr. Scott was obligated to open the door because “the officer kept slamming on it.” Martin, J. dissenting at 1297. A handful of knocks, without any verbal demand, does not create a non-consensual “obligation” to answer the door, and the undisputed facts here indicate that Sylvester had his gun behind his leg when he knocked on the door. Sylvester’s gun was not pointed at the door or the house before the door opened.
In any event, cases from other circuits do not create clearly established federal law for this circuit. Coffin, 642 F.3d at 1013.
V. CONCLUSION
In conducting its qualified immunity analysis, the district court’s decision viewed the facts in the light most favorable to the plaintiffs. When there were disputes in the record, it accepted the plaintiffs’ version of these tragic facts as true. The district court thoroughly and diligently reviewed the facts and legal issues in this case. At a minimum, the district court committed “no reversible error” because no clearly established federal law gave clear and fair notice that Deputy Sylvester’s conduct was unlawful. The panel’s affirmance is not en banc worthy under Federal Rule of Appellate Procedure 35.
Finally, it is important to stress • that orders denying rehearing en bane, even this published one, have no binding or precedential value. We have explained why before, stating:
“[W]hile [we] would like to think that [our] judicial colleagues chose not to vote this case en banc because they opined that the panel reached a correct result for the right reasons, [we are] well aware that some [voting against rehearing en banc] may have disagreed with the panel but knew that the opinion would be non-precedential. A denial of en banc rehearing is similar to a denial of certiorari by the Supreme Court; it communicates little, if anything, about the position of the court or the issues presented. Indeed, although [the panel members] have outlined the reasoning underlying our ... views of the court’s denial of en banc rehearing in this particular case, our opinions in this regard, like [the dissent’s and] the court’s decision to deny rehearing, have no binding or precedential value.”
Riley v. Camp, 130 F.3d 958, 983 n.7 (11th Cir. 1997) (Birch, J., concurring in the denial of rehearing en banc). Accordingly, nothing in this order is binding or has precedential value.[9]

. The only defendant sued in his individual capacity is Deputy Sylvester. None of the other officers with him were sued. Because the dissents focus on the claims against defendant Sylvester, we do too.

. Plaintiff Mauck’s testimony is consistent with Deputy Sylvester, who said: "I knocked on the door in two separate sets of three knocks each, waiting between each set for a response.”

. When determining whether the unlawfulness of an officer’s actions was already clearly established, we look to the state of the law on the date of the challenged conduct. Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002); see also Fish v. Brown, 838 F.3d 1153, 1162-63 (11th Cir. 2016).

. There is only one exception “to the rule requiring particularized case law to establish clearly the law in excessive force cases.” Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000). That exception is an “obvious clarity” case where the official's conduct is "so egregious that a constitutional right was clearly violated, even in the total absence of case law.” Maddox v. Stephens, 727 F.3d 1109, 1121 (11th Cir. 2013) (quotation marks omitted). In such a case, "the official's conduct lies so obviously at the very *1282 core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw.” Priester, 208 F.3d at 926. ''Our case law has made clear that 'obvious clarity’ cases will be rare,” and the plaintiffs on appeal did not argue this was an "obvious clarity” case. Coffin v. Brandau, 642 F.3d 999, 1015 (11th Cir. 2011) (en banc).

. As to qualified immunity, the defendant has the burden to show he was acting within his discretionary authority. It is undisputed that Deputy Sylvester acted within his discretionary authority. Therefore, the burden shifted to the plaintiffs to demonstrate that Sylvester violated the plaintiffs’ clearly established constitutional rights. Carter v. Butts Cty., 821 F.3d 1310, 1319 (11th Cir. 2016).

. In Menuel, the girl's family called 911, reporting that the girl was behaving violently and erratically. 25 F.3d at 991. The girl locked herself in the bedroom after attacking several officers with a butcher knife. Id. at 992. When the officers later entered the bedroom the girl shot at them with a handgun, which generated a muzzle flash. Id. The officers then fired eight shots, which killed her. Id.

. To be clear, the events that occurred after the door opehed are properly analyzed under the excessive force category of Fourth Amendment seizure claims, and the plaintiffs presented a claim under that theory, albeit one that ultimately fails due to qualified immunity. The officers’ actions prior to the door opening are analyzed under the scope of a permissible knock and talk.

. The Fifth Circuit has acknowledged that Gomez-Moreno was overruled in some respects by Kentucky v. King, 563 U.S. 452, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011). United States v. Montgomery, 777 F.3d 269, 273 (5th Cir. 2015).

. One dissent laments that our panel decision may encourage other law enforcement officers in similar conduct, but, respectfully, our summary, non-published panel opinion here does not do that.